[No. S071999. Aug. 19, 1999.]

THE PEOPLE, Plaintiff and Appellant, v.
ANDRE LAMONT RAY, Defendant and Respondent.

COUNSEL

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen, Raymond A. Cardozo and Juliet B. Haley, Deputy Attorneys General, for Plaintiff and Appellant.

Cooper, Arguedas & Cassman and Ted W. Cassman for Defendant and Respondent.

## OPINION

**BROWN, J.**—In the average day, police officers perform a broad range of duties, from typical law enforcement activities—investigating crimes, pursuing suspected felons, issuing traffic citations—to "community caretaking functions"—helping stranded motorists, returning lost children to anxious parents, assisting and protecting citizens in need—"totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (*Cady* v. *Dombrowski* (1973) 413 U.S. 433, 441 [93 S.Ct. 2523, 2528, 37 L.Ed.2d 706].) When performing their law enforcement responsibilities, officers are required under the Fourth Amendment to obtain

a warrant before searching a house or seizing personal effects;[1] or it must be established they acted pursuant to a recognized exception to that requirement. In this case, we address the extent to which the Fourth Amendment operates when the police are discharging one of their community caretaking functions. We conclude under these facts that the officers acted reasonably to protect the safety and security of persons and property when they briefly entered defendant's residence without a warrant and then observed contraband in plain view. Accordingly, we affirm the judgment of the Court of Appeal holding that the trial court should not have suppressed the evidence.

FACTUAL AND PROCEDURAL BACKGROUND

About 3:30 p.m. on Christmas Day 1996, Officers Tan and Cary of the Richmond Police Department received the following dispatch: "An open door at 4 Park Lane, number 4 Park Lane. PR [person reporting] says that the door has been open all day and it's all a shambles inside. It's unknown if anyone's home but the PR doesn't think so. The PR can be contacted if necessary." Tan arrived at the location within five minutes. At the time, he "was concerned for possibly the life and property on the inside of the house, welfare of the people inside." Cary arrived about two minutes later and observed the reporting person pointing to the residence in question. The officers approached the front door, which was open approximately two feet. In Cary's experience, this circumstance correlated to a "95 percent" likelihood they had encountered a burglary or similar situation.

Looking inside, Tan saw "clothing, paper, strewn on the ground, on the sofa. It was just a real mess inside; [it] looked like someone had gone through the house." In Cary's estimation, "the front room appeared to be ransacked as if someone went through it." Although there were no signs of forced entry, their observations heightened both officers' initial apprehension: "It appeared that someone might have been inside, a burglary attempt or in the progress, or the welfare [sic] of the people inside." The officers knocked several times, loudly announcing their presence, but received no response. Increasingly concerned, they entered to conduct a security check "to see if anyone inside might be injured, disabled, or unable to obtain help" and to determine whether a burglary had been committed or was in progress. They found no one inside but did observe a large quantity of suspected cocaine and money in plain view. No interior doors or containers were

---

[1]The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

opened, and they did not touch anything. Tan and Cary left the residence and informed their supervisor of their observations, which formed the basis of a subsequent search warrant. Evidence seized pursuant to the warrant led to charges against defendant of possessing more than 10 kilograms of cocaine (Health & Saf. Code, §§ 11351, 11370.4), possessing cocaine base for sale (*id.*, § 11351.5), and manufacturing a controlled substance (*id.*, § 11379.6, subd. (a)).

Defendant moved to suppress the evidence because the officers did not have a warrant when they initially entered his residence. The prosecution attempted to justify their action on exigent circumstances. At the conclusion of the suppression hearing, the superior court found: "This is one of those types of situations where I don't believe that the police officers acted improperly in the sense that they were performing a community service or community value. That's what they are there to do. And when doors are open, we will hope that they will take some steps to find out what is going on. [¶] . . . [¶] The testimony which has been presented to me would indicate that these officers were aware that a door had been open all day. That the person[s] who were the occupants of the premises had not been there, and that the place was in shambles. Those are the major portions of the information they had. [¶] . . . [¶] . . . [¶] I don't feel on the facts of this case, there was sufficient information [that] would justify the officer to believe that an exigent circumstance was taking place at that point. . . . [¶] It's one of those situations, I think, where it's not uncommon where people leave their doors open. And we commend the officers for at least doing their community service to try to protect people and help people. But there are going to be situations where in fact in doing that they are going to come inside and discover evidence of a crime. And it's going to turn out unfortunately it is not admissible. And I think this is one of those situations. [¶] I do not in any way think that the officers were necessarily wrong in what they did, but if we are going to get into a situation where you are going to prosecute somebody for a crime in this situation, I think they needed to get a search warrant. Motion is granted."

On appeal, the controversy centered on whether the warrant exception for exigent circumstances required a showing of probable cause or reasonable suspicion. Reviewing pertinent case authority, the Court of Appeal struck a balance in favor of reasonable suspicion. "While probable cause is too onerous a standard, a warrantless entry justified by a reasonable suspicion of exigency permits a balance between the need for prompt action and the right to be free from unreasonable governmental intrusion." Since the record established "the officers reasonably suspected that an exigency existed requiring their immediate warrantless entry," the court reversed the suppression ruling. In reaching this conclusion, it noted the tension between the trial

court's finding that "the officers were acting properly in their roles as community caretakers and had done nothing wrong" and the deterrent effect of excluding the evidence. (See, e.g., *United States* v. *Leon* (1984) 468 U.S. 897, 918-921 [104 S.Ct. 3405, 3418-3419, 82 L.Ed.2d 677].)

We granted defendant's petition for review.

## DISCUSSION

■ Both the trial court and the Court of Appeal analyzed the facts and law under the exigent circumstances exception to the Fourth Amendment warrant requirement (see, e.g., *Schmerber* v. *California* (1966) 384 U.S. 757, 770-771 [86 S.Ct. 1826, 1835-1836; 16 L.Ed.2d 908]; *McDonald* v. *United States* (1948) 335 U.S. 451, 456 [69 S.Ct. 191, 193-194, 93 L.Ed. 153]), reaching different conclusions as to the standard by which exigency should be assessed. On review, the Attorney General urges this court to affirm the Court of Appeal on the basis of the "emergency aid" exception, which he characterizes as a variant of exigent circumstances.[2] (See 3 LaFave, Search and Seizure (3d ed. 1996) § 6.6(a), p. 390, fn. 5 (3 LaFave).)

■ Under the emergency aid exception, police officers "may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." (*Root* v. *Gauper* (8th Cir. 1971) 438 F.2d 361, 364-365.) " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [Citations.]" (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 392-393 [98 S.Ct. 2408, 2413, 57 L.Ed.2d

---

[2]Defendant contends the People are precluded from proffering this justification because they failed to raise it below. (See Cal. Rules of Court, rule 29(b); see also, e.g., *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 865, fn. 4 [50 Cal.Rptr.2d 242, 911 P.2d 429].) A review of the record contradicts this assertion. In their written response to the motion to suppress in the superior court, the People specifically contended, "To THE EXTENT THERE IS A 'COMMUNITY CARETAKING FUNCTIONS' EXCEPTION THE PEOPLE HEREBY ASSERT IT (CADY v. DOMBROWSKI, 413 U.S. 433 . . . (1973).)" The trial court did not expressly rule on this argument; nevertheless, the People's contention and citation were sufficient to preserve review by putting defendant on notice of the prosecution's various theories of justification. (Cf. *People* v. *Williams* (1999) 20 Cal.4th 119, 137-138 [83 Cal.Rptr.2d 275, 973 P.2d 52].) Moreover, although the community caretaker function is conceptually distinct from exigent circumstances, the record suffices to address the issue as a question of law. (See *Cedars-Sinai Medical Center* v. *Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511]; see also *People* v. *Hill* (1974) 12 Cal.3d 731, 754 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *De Vaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872], [addressing emergency aid doctrine even though People relied solely on "hot pursuit"].)

290]; *Wayne* v. *United States* (D.C. Cir. 1963) 318 F.2d 205, 212 [115 App.D.C. 234]; see generally, 3 LaFave, *supra*, § 6.6(a), p. 390.)

Contrary to the view of the Attorney General, however, the emergency aid doctrine is not a subcategory of the exigent circumstances exception to the warrant requirement. Rather, it is a subcategory of the community caretaking exception, a distinctly different principle of Fourth Amendment jurisprudence. "When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. [Citations.] In contrast, the community caretaker exception is only invoked when the police are not engaged in crime-solving activities." (*People* v. *Davis* (1993) 442 Mich. 1, 24 [497 N.W.2d 910, 920]; *State* v. *Carlson* (Iowa 1996) 548 N.W.2d 138, 141; see also *People* v. *Gardner* (1984) 121 Ill.App.3d 464, 468-470 [76 Ill.Dec 761, 764-766, 459 N.E.2d 676, 679-681]; *State, etc.* v. *District Court, etc.* (1979) 180 Mont. 548, 553-554 [ 591 P.2d 656, 659-660].) With respect to Fourth Amendment guaranties, this is the key distinction: "[T]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police." (*People* v. *Davis, supra*, 442 Mich. at p. 22 [497 N.W.2d at p. 919]; see *post*, fn. 4.) Upon entering a dwelling, officers view the occupant as a potential victim, not as a potential suspect.

Professor LaFave discusses at some length the distinction between entering premises with the intent of investigating suspected or known crimes and entering for other reasons. "Preceding sections of this Chapter have been concerned with the entry of private premises by police for the purpose of arresting a person thought to be within or for the purpose of finding the fruits, instrumentalities or evidence of some past crime. Although it is entries for those purposes which most often give rise to a motion to suppress, requiring a ruling upon the validity of the entry and subsequent conduct of the police, quite clearly police have occasion to enter premises without a warrant for a variety of other purposes. The police have 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by design or default, the police are also expected to 'reduce the opportunities for the commission of some crimes through preventive patrol and other measures,' 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' 'resolve conflict,' 'create and maintain a feeling of security in the community,' and 'provide other services on an emergency basis.' An entry . . . for such reasons as these may sometimes result in the discovery of

evidence of crime, in which case a determination of the lawfulness of such police activity is required." (3 LaFave, *supra*, § 6.6, pp. 389-390, fns. omitted.)

This latter-day role of law enforcement differs decidedly from the concerns that prompted the framers of our Constitution to adopt the Fourth Amendment—use of the abhorred general warrants to suppress political and religious nonconformity and reliance on writs of assistance to search indiscriminately homes and businesses for suspected contraband. (See *State* v. *Bridewell* (1988) 306 Or. 231, 241-252 [759 P.2d 1054, 1060-1068] (conc. and dis. opn. of Peterson, C. J.).) Moreover, "[o]ur [contemporary] society . . . is an impersonal one. Many of us do not know the names of our next-door neighbors. Because of this, tasks that neighbors, friends or relatives may have performed in the past now fall to the police." (*Id.* at p. 254 [759 P.2d at p. 1068].) Local police "should and do regularly respond to requests of friends and relatives and others for assistance when people are concerned about the health, safety or welfare of their friend, loved ones and others." (*Id.* at p. 240, fn. 1 [759 P.2d at p. 1060].)

■■ Courts refer to these diverse police duties and responsibilities collectively as "community caretaking functions." (See, e.g., *State* v. *Alexander* (1998) 124 Md.App. 258, 267 [721 A.2d 275, 279]; *People* v. *Davis*, *supra*, 442 Mich. at pp. 23-25 [497 N.W.2d at pp. 920-921]; *State* v. *Bridewell*, *supra*, 306 Or. at pp. 252-254 [759 P.2d at pp. 1067-1068] (conc. and dis. opn. of Peterson, C. J.); see also *Cady* v. *Dombrowski*, *supra*, 413 U.S. at p. 441 [93 S.Ct. at p. 2528].) Nonetheless, "[w]hile categorizing these different activities under the heading of 'community caretaking functions' may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard. Community caretaking activities are varied and are performed for different reasons." (*People* v. *Davis*, *supra*, 442 Mich. at p. 25 [497 N.W.2d at pp. 920-921].) Each variant must be assessed according to its own rationale on a case-by-case basis. "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." (*New Jersey* v. *T. L. O.* (1985) 469 U.S. 325, 337 [105 S.Ct. 733, 740, 83 L.Ed.2d 720].)

■■ We agree with defendant that the People did not meet their burden of establishing circumstances warranting the officers' actions under the emergency aid component of community caretaking. This justification requires specific, articulable facts indicating the need for " 'swift action to prevent imminent danger to life or serious damage to property . . . .'

[Citation.]" (*People* v. *Duncan* (1986) 42 Cal.3d 91, 97 [227 Cal.Rptr. 654, 720 P.2d 2].) The record fails to meet this standard. The officers were concerned for the possibility of an injured person inside the residence but had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb. (See *People* v. *Davis, supra,* 442 Mich. at pp. 27-28 [497 N.W.2d at pp. 921-922].)

 This determination does not end our inquiry, however. Under the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry, including the protection of property, as "where the police reasonably believe that the premises have recently been or are being burglarized." (3 LaFave, *supra,* § 6.6(b), p. 403, fns. omitted.) "Although the case law attaches slightly greater weight to the protection of persons from harm than to the protection of property from theft, many of the cases involving possible burglaries or breakings and enterings stress the dual community caretaking purpose of protecting both. [Citations.]" (*State* v. *Alexander, supra,* 124 Md.App. at p. 276 [721 A.2d at p. 284], and cases cited therein.) Of necessity, officers may enter premises to resolve the situation and take further action if they discover a burglary has occurred or their assistance is otherwise required. (E.g., *State* v. *Alexander, supra,* 124 Md.App. at pp. 273-275 [721 A.2d at pp. 282-284]; see *People* v. *Hill, supra,* 12 Cal.3d at p. 755; *State* v. *Bridewell, supra,* 306 Or. at p. 253 [759 P.2d at pp. 1067-1068] (conc. and dis. opn. of Peterson, C. J.); see also 3 LaFave, *supra,* § 6.6(b), pp. 406-407; cf. *In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957] [principal function of detaining officer's investigation is to resolve ambiguity and establish legality or illegality of detainee's activity]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 22-23 [88 S.Ct. 1868, 1880-1881, 20 L.Ed.2d 889].)

Although this court has not articulated these principles in terms of "community caretaking functions," it has long recognized that "[n]ecessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. [Citations.]" (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721].) In *People* v. *Roberts,* officers went to an apartment believed occupied by the defendant following a burglary. They were told "he had not worked often and was sickly." (*Id.* at p. 376.) They received no response to their knock at the door, but "heard several moans or groans that sounded as if a person in the apartment were in distress . . . ." (*Ibid.*) Upon entering, they looked in various rooms but found no one. During this check, which took two or three minutes, one of them saw in plain view a new radio with a serial number that matched

property taken in the burglary; on that basis they obtained a search warrant and seized the radio. "The trial court found that the officers reasonably believed that someone inside the apartment was in distress and in need of assistance and that they entered for the purpose of giving aid." (*Id.* at p. 377.) Even though the officers found no one inside, their actions were proper because they "only [made] that kind of search reasonably necessary to determine whether a person was actually in distress somewhere in the apartment. They could not, for example, ransack the premises or rummage through desk drawers. On the other hand, in the course of conducting a reasonable search they did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. [Citations.]" (*Id.* at pp. 378-379.)

In reaching this conclusion, we cited among other authorities the Restatement of Torts. It provides that "[o]ne is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to [¶] . . . [¶] (b) the other or a third person, or the land or chattels of either . . . ." (Rest.2d Torts, § 197; *People* v. *Roberts*, *supra*, 47 Cal.2d at pp. 377-378; see *State* v. *Alexander*, *supra*, 124 Md.App. at p. 275 [721 A.2d at pp. 283-284]; see also *People* v. *Parra* (1973) 30 Cal.App.3d 729, 732-733 [106 Cal.Rptr. 531]; *People* v. *Gomez* (1964) 229 Cal.App.2d 781, 783 [40 Cal.Rptr. 616].) It would be anomalous to deny a police officer charged with protecting the citizenry a privilege accorded every other individual who intercedes to aid another or to protect another's property. (*State* v. *Bridewell*, *supra*, 306 Or. at pp. 253-254 [759 P.2d at pp. 1067-1068] (conc. and dis. opn. of Peterson, C. J.).)

In *People* v. *Hill*, *supra*, 12 Cal.3d at pages 754-755, we relied on *People* v. *Roberts*, *supra*, 47 Cal.2d 374, in again concluding, "A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. [Citations.]" In *Hill*, the officers reasonably believed someone within the premises might require aid and "entering . . . was the only practical means of determining whether there was anyone inside in need of assistance." (12 Cal.3d at p. 755.)

State court decisions are in accord with these principles.[3] For present purposes, *State* v. *Alexander*, *supra*, 124 Md.App. 258 [721 A.2d 275], is

---

[3]See, for example, *City of Highland Park* v. *Lee* (1997) 291 Ill.App.3d 48, 51-52 [225 Ill.Dec. 459, 683 N.E.2d 962 ]; *State* v. *Carlson*, *supra*, 548 N.W.2d at pages 140-141; *State* v. *Tarvers* (1998) 1998 Me. 64 [709 A.2d 726, 727]; *State* v. *Will* (1994) 131 Or.App. 498, 502-503 [885 P.2d 715]; *State* v. *Cook* (R.I. 1982) 440 A.2d 137, 139; *State* v. *Angelos* (1997) 86 Wn.App. 253, 256-257 [936 P.2d 52]; and cases cited in *Mincey* v. *Arizona*, *supra*, 437 U.S. at page 393, footnote 6 [98 S.Ct. at page 2413].

particularly instructive. In that case, an anonymous caller reported to the local police on Thanksgiving Day that his next-door neighbor's basement door was open and he believed the neighbor was away. (*Id.* at p. 262 [721 A.2d at p. 277].) The responding officer "noticed that the basement door was 'wide open,' but observed no signs of a forcible entry." (*Id.* at p. 263 [721 A.2d at pp. 277-278].) Nevertheless, his training and experience suggested a breaking and entering was in progress, and he called for assistance. In the meantime, he announced his presence and knocked on the front door; he heard a dog barking inside but otherwise received no reply. (*Id.* at p. 264 [721 A.2d at p. 278].) When the officer's backup arrived, the two entered through the open basement door "and began a sweep of the residence to determine if anyone was inside. They first noticed that the basement was in disarray. While still searching for possible intruders, they opened the door of a walk-in closet [and] observed marijuana on a shelf in plain view." (*Ibid.*)

Although "sympathiz[ing] with the police officers' perspective," the trial court suppressed the evidence. (*State* v. *Alexander, supra,* 124 Md.App. at p. 264 [721 A.2d at p. 278].) The appellate court reversed. In terms apropos to our inquiry, the court explained its reasoning: "When the police initially entered the home of the [defendants], the [defendants] were not the target of any police investigation nor were they believed to be harboring fugitives or concealing evidence of crime. There was, moreover, no remote hint of subterfuge; no narcotics officers were waiting, opportunistically, for an excuse to reconnoiter an otherwise protected asylum. [¶] It is undisputed that the police were not pursuing the [defendants] but were attempting to come to their possible aid. Fourth Amendment justification for seizing the persons of the [defendants] or for searching their home for evidence of crime, therefore, was not in any way an issue. Probable cause to invade the Fourth Amendment rights of a suspect, as the basis for either a search warrant or for appropriate warrantless activity, was not in any way an issue. The [defendants] were not suspects but citizens in possible distress. From the police perspective at all times prior to the ultimate discovery of drugs . . . , the [defendants] were innocent homeowners who were the possible victims of a crime and who were deserving of prompt police intervention and protection." (*Id.* at pp. 261-262 [721 A.2d at p. 277].)

The court sustained its decision based on the dual community caretaking functions of aiding persons in need of assistance and protecting property, noting both were well grounded in Fourth Amendment jurisprudence and supported by principles articulated in case authority as well as the Restatement Second of Torts. (*State* v. *Alexander, supra,* 124 Md.App. at pp. 266-276 [721 A.2d at pp. 279-284].) It further concluded a probable cause standard was inappropriate in such circumstances. (*Id.* at pp. 276-280 [721

A.2d 284-286].) "When the police cross a threshold not in their criminal investigatory capacity[4] but as part of their community caretaking function, it is clear that the standard for assessing the Fourth Amendment propriety of such conduct is whether they possessed a reasonable basis for doing what they did. Professor LaFave explained . . . : 'An objective standard as to the reasonableness of the officer's belief [that it is necessary to act] must be applied.' Thus, the question is . . . whether there is 'evidence which would lead a prudent and reasonable official to see a need to act.' The officer must 'be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion.' [Citations.]" (*State* v. *Alexander, supra*, 124 Md.App. at pp. 276-277 [721 A.2d at pp. 284-285], italics omitted; see *People* v. *Duncan, supra*, 42 Cal.3d at pp. 97-98; see generally, 3 LaFave, *supra*, § 6.6(a), p. 391.)

The Michigan Supreme Court reached a similar conclusion in *People* v. *Davis*, regarding the relevance of probable cause in this circumstance. "[W]hen the actions of agents of the state fall under one of these exceptions, . . . such agents generally need not have the probable cause traditionally required in searches for evidence in order to enter into a protected area. . . . [W]hen police are performing 'caretaking' functions, they are usually not searching for anything." (*People* v. *Davis, supra*, 442 Mich. at pp. 11-12 [497 N.W.2d at p. 915].) The court also found it "clear" from the United States Supreme Court's opinion in *Cady* v. *Dombrowski, supra*, 413 U.S. 433, "that the concepts of probable cause and reasonable suspicion were inapposite to an inquiry into whether the police action . . . violated the Fourth Amendment. The Court's opinion suggested that because the police were not looking for any evidence of a crime, they needed no suspicion at all to 'search.' " (*People* v. *Davis, supra*, 442 Mich. at p. 22 [297 N.W.2d at p. 919]; see also *State* v. *Alexander, supra*, 124 Md.App. at pp. 277-280 [721 A.2d at pp. 284-287].)

■ We agree with the foregoing observations and conclusions. The appropriate standard under the community caretaking exception is one of

---

[4]In an explanatory footnote, the court clarified its terminology as it relates to the constitutional principles at issue: "A note of caution is in order about our use of the term 'non-investigatory capacity.' When in the context of a possible burglary or breaking and entering, the police enter a home or other structure in order to come to the aid of a possibly injured or threatened owner or to protect the property of that owner, they are, in one sense of the term, quite obviously investigating the possibility that a crime has occurred. Their purpose vis-à-vis the burglar they may catch is, of course, 'investigatory.' [¶] With respect, on the other hand, to the presumably innocent victims of possible crimes, where persons and/or property are in apparent danger, the police intervention is 'non-investigatory' in its purpose and the constraints and hesitation that routinely inhibit a criminal investigation are inappropriate." (*State* v. *Alexander, supra*, 124 Md.App. at p. 277, fn. 2 [721 A.2d at p. 284], italics omitted; see *id.* at p. 273 [721 A.2d at pp. 282-283]; but see *In re Forfeiture of $176,598 U.S. Currency* (1993) 443 Mich. 261, 274 [505 N.W.2d 201].)

reasonableness: Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions? Which is not to say that every open door—even in an urban environment—will justify a warrantless entry to conduct further inquiry. Rather, as in other contexts, "in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary." (*People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

In adopting a community caretaking exception, we emphasize two aspects critical to maintaining the essential constitutional balance. First, the authority granted law enforcement is narrowly delimited by the known facts viewed in light of the rationale for the exception. "The privilege to enter to render aid does not, of course, justify a search of the premises for other purposes. [Citation.] To the contrary, the warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it. [Citations.]" (*People* v. *Hill, supra,* 12 Cal.3d at p. 755.) "The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance [or property is at risk] and to provide that assistance [or to protect that property]." (3 LaFave, *supra,* § 6.6(a), p. 401, fn. omitted; *id.,* § 6.6(b), p. 406.)

Second, "courts must be especially vigilant in guarding against subterfuge, that is, a false reliance upon the [personal safety or] property protection rationale when the real purpose was to seek out evidence of crime." (3 LaFave, *supra,* § 6.6(b), p. 406, fn. omitted; *id.,* § 6.6(a), p. 402; *People* v. *Roberts, supra,* 47 Cal.2d at p. 378; *People* v. *Gardner, supra,* 121 Ill.App.3d at p. 470 [459 N.E.2d at pp. 680-681].) "The entry cannot be made on the pretext to search for contraband or illegal activity rather than to look for [burglary] suspects and to preserve an occupant's property. [Citation.]" (*Carroll* v. *State* (1994) 335 Md. 723, 735 [646 A.2d 376, 382].) In this regard, the trial courts play a vital gatekeeper role, judging not only the credibility of the officers' testimony but of their motivations. Any intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives. (Cf. *People* v. *Duncan, supra,* 42 Cal.3d at p. 104 ["[I]f . . . officers act in a manner inconsistent with a motive to preserve life or property, the warrantless entry or search cannot be justified after the fact by employing the exigent circumstances doctrine. [Citation.]"].)

The facts before us precisely illustrate one facet of law enforcement's community caretaking functions. The officers were called to defendant's apartment based on a neighbor's report that the front door had been "open all day and it's all a shambles inside." The neighbor did not know for certain but thought no one was at home. Upon arrival, the officers found the scene as described, which in light of their training and experience justifiably aroused concern for the welfare of persons inside and the possibility of a burglary in progress. Although there were no signs of forced entry, everything they could observe from outside the residence heightened rather than allayed these concerns. Despite knocking several times and announcing their presence, they received no response and entered only to conduct a security check. In the process, which took seven to eight minutes and did not involve opening any interior doors or containers, they observed suspected contraband and money in plain view. These observations provided the basis for securing a search warrant pursuant to which the evidence was seized.

In evaluating this conduct—and implicitly the officers' credibility—the superior court found: "The testimony which has been presented to me would indicate that these officers were aware that a door had been open all day. That the person[s] who were the occupants of the premises had not been there, and that the place was in shambles." "This is one of those types of situations where I don't believe that the police officers acted improperly in the sense that they were performing a community service or community value. That's what they are there to do. And when doors are open, we will hope that they will take some steps to find out what is going on." Plainly, these findings invoke community caretaking principles. While the facts known to the officers may not have established exigent circumstances or the apparent need to render emergency aid, they warranted further inquiry to resolve the possibility someone inside required assistance or property needed protection. In such circumstances, "entering the premises was the only practical means of determining whether there was anyone inside in need of assistance [or property in need of protection]." (*People* v. *Hill, supra,* 12 Cal.3d at p. 755; *People* v. *Roberts, supra,* 47 Cal.2d at pp. 378-379.)

Defendant contends the officers did not act reasonably because they failed to take reasonable steps short of entry, such as contacting the reporting person, checking the rear of the residence, and determining whether his vehicles were in the carport. The fact officers could have done something more before entering is not dispositive; their failure to take additional action must be viewed in the totality of the circumstances to determine the ultimate reasonableness of their intrusion. (See, e.g., *State* v. *Alexander, supra,* 124 Md.App. at pp. 282-283 [721 A.2d at pp. 287-288]; *People* v. *Davis, supra,* 442 Mich. at pp. 26-28 [497 N.W.2d at pp. 921-922].) For example, in

*People* v. *Davis, supra*, 442 Mich. 1 [497 N.W.2d 910], the officers failed to make further inquiry regarding a report of "shots fired" at a motel, but instead demanded immediate entry into the defendant's room and entered forcibly when she did not open the door. The court acknowledged such a report could justify a warrantless entry; however, in that case the report had come "from a somewhat questionable source . . . ." (*Id.* at p. 28 [497 N.W.2d at p. 922].) Because the motel manager had been available to provide corroboration if any existed, the officers did not act reasonably under the community caretaking emergency aid doctrine. (*Ibid.*)

This case, however, more closely resembles the facts of *State* v. *Alexander, supra*, 124 Md.App. 258 [721 A.2d 275]. There, the defendant also argued the officers acted precipitously in entering his residence without further inquiry such as contacting the reporting neighbor. The court rejected this argument because the officers through their own observations had already verified the information given and had sufficient knowledge of the apparent circumstances to act without more. (*State* v. *Alexander, supra*, 124 Md.App. at p. 283 [721 A.2d at pp. 287-288].) Similarly here, the officers observed through the open door an interior that appeared "ransacked" and unattended by any occupant, or perhaps worse, an injured occupant. Those facts would suffice to cause a reasonable officer to promptly resolve the uncertainty. As both Cary and Tan testified, their training counseled that time was of the essence in these circumstances.

Like the superior court, "we commend the officers for at least doing their community service to try to protect people and help people." "[W]hen doors are open, we will hope that [officers] will take steps to find out what is going on. . . ." That is what law-abiding, tax-paying citizens desire and expect of their local constabulary. "The fact that abuses [may] sometimes occur during the course of criminal investigations should not give a sinister coloration to procedures which are basically reasonable." (*People* v. *Roberts, supra*, 47 Cal.2d at p. 380.) When officers act in their properly circumscribed caretaking capacity, we will not penalize the People by suppressing evidence of crime they discover in the process.

We also agree with the Court of Appeal that suppressing reliable physical evidence under such circumstances does not advance the deterrence rationale of the exclusionary rule. When the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." (*Stone* v. *Powell* (1976)

428 U.S. 465, 539-540 [96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067] (dis. opn. of White, J.); see *id.* at pp. 486-487 [96 S.Ct. at pp. 3048-3049]; *United States* v. *Leon, supra,* 468 U.S. at pp. 918-920 [104 S.Ct. at pp. 3418-3419]; *Michigan* v. *Tucker* (1974) 417 U.S. 433, 447 [94 S.Ct. 2357, 2365, 41 L.Ed.2d 182].)

An officer "less willing" to discharge community caretaking functions implicates seriously undesirable consequences for society at large: In that event, we might reasonably anticipate "the assistance role of law enforcement . . . in this society will go downhill . . . . The police cannot obtain a warrant for . . . entry. [W]ithout a warrant, the police are powerless. In the future police will tell such concerned citizens, 'Sorry. We can't help you. We need a warrant and can't get one.' " (*State* v. *Bridewell, supra,* 306 Or. at p. 254 [759 P.2d at p. 1068] (conc. and dis. opn. of Peterson, C. J.).) Or, as the Court of Appeal expressed it, "to the extent the [trial] court's sanction discourages similar conduct, it serves only to hamper lawful and proper police conduct."

CONCLUSION

"It is important to point out that crime prevention and patrol activities, just as the Fourth Amendment, seek to promote the protection of the citizen and citizenry. Certainly a balance must be maintained between the recognition of the liberty of a citizen to be free from unreasonable searches and seizures and the recognition of the common sense performance of law enforcement activities. It is the duty of the court to seek a reconciliation of these principles whenever circumstances suggest a collision course; such reconciliation is not determined by a pronouncement of general principles of recognition but rather by an evaluation of the facts of the particular situation and an application of these principles to those facts." (*State* v. *Hetzko* (Fla.Dist.Ct.App. 1973) 283 So.2d 49, 52, italics omitted.)

DISPOSITION

The judgment of the Court of Appeal is affirmed.

Kennard, J., and Baxter, J., concurred.

**GEORGE, C. J.,** Concurring.—I agree with the lead opinion that the officers' warrantless entry into the residence was proper, but I reach that conclusion by applying the "exigent circumstances" exception to the warrant requirement as discussed in *People* v. *Duncan* (1986) 42 Cal.3d 91 [227 Cal.Rptr. 654, 720 P.2d 2].

In *Duncan*, a police officer "responded to a radio call that a burglary was in progress or had just occurred. He arrived promptly at the scene and spoke to a neighbor" who stated he had seen suspects outside the residence. (*People* v. *Duncan, supra,* 42 Cal.3d 91, 95.) The officer inspected the residence and found "the doors locked but a back window open. On the ground beneath the window was a box containing a television set and other items. Surmising that one or more of the burglars was still inside, [the officer] climbed in the open window to search for intruders." (*Id.* at pp. 95-96.) There were no burglars in the residence, but the officer found himself in the midst of "an illicit drug laboratory." (*Id.* at p. 96.)

To justify this warrantless entry, the People relied upon the exigent circumstances exception to the warrant requirement. "We have defined 'exigent circumstances' to include 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property . . . .' [Citation.] The action must be 'prompted by the motive of preserving life or property and [must] reasonably appear[] to the actor to be necessary for that purpose.' [Citation.]" (*People* v. *Duncan, supra,* 42 Cal.3d 91, 97.)

We held that the warrantless entry was justified by the exigent circumstance of a burglary in progress, noting that the defendants had conceded "that an officer may enter a dwelling without a warrant if he reasonably believes a burglary is being committed therein." (*People* v. *Duncan, supra,* 42 Cal.3d 91, 98.) The officer reasonably believed that a burglary was in progress, because he had heard a police broadcast that a burglary either had occurred or was occurring and had spoken to a neighbor who had seen suspects outside the residence. Upon inspecting the residence, the officer "found an open window with a television and other articles beneath it." (*Ibid.*)

In the present case as well, the officers were justified in entering the residence without a warrant, because they reasonably believed that a burglary was in progress or that a burglary had occurred and there might be occupants in need of assistance inside the residence. The officers received a police dispatch that the door of the residence had been open all day and "it's all a shambles inside." The officers went to the residence and found the door open approximately two feet. Looking inside, one officer saw "clothing, paper, strewn on the ground, on the sofa. It was just a real mess inside." That officer stated that it "looked like somebody had gone through the house." The other officer testified that from his experience he believed there was a "95 percent" likelihood the premises had been burglarized. After knocking on the door with no response, the officers entered "to see if anyone inside might be injured, disabled, or unable to obtain help" and to determine whether a burglary had been committed or was in progress.

Under these circumstances, it was reasonable for the officers to enter the residence without a warrant. Exigent circumstances existed, because the officers had reasonable cause to believe a burglary was in progress, or that a burglary had been committed and there might be persons inside the residence in need of assistance. Accordingly, I agree that the judgment of the Court of Appeal should be affirmed.

Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I dissent.

I disagree with the concurring opinion that the warrantless search in this matter was justifiable under the exception for exigent circumstances or because, as the lead opinion concludes, the police were exercising a "community caretaking function."

I firmly reject the suggestion that we should create a broad new exception to the Fourth Amendment protection against warrantless searches, permitting police officers to enter a residence, even when there is no immediate threat to its occupants, merely as part of their "community caretaking functions." Such an exception threatens to swallow the rule that absent a showing of true necessity, the constitutionally guaranteed right to security and privacy in one's home must prevail. I strongly disagree with the assumption that the warrantless search of a residence, under nonexigent circumstances, can be justified on the paternalistic premise that "We're from the government and we're here to help you."

I

On December 25, 1996, at approximately 3:30 in the afternoon, Richmond police officers responded to a secondhand report by a neighbor that the door to defendant's residence had been left open all day, no one was home, and the house was a "shambles." When they arrived, the officers saw that the door was ajar, open approximately two feet. There was no evidence of forced entry; an expensive-looking television and stereo situated near the front door did not appear to have been disturbed. Nor was there any indication that anyone was inside; there was no response to their knocks or their announcement that they were from the Richmond Police Department. They entered, guns drawn, to perform a "security check." One of the officers reported "a real mess inside."[1]

During their walk through the house, the officers noticed what appeared to be cocaine and paraphernalia for making crack cocaine in the kitchen, and a

---

[1]One officer testified that as he stood at the front door, he noticed that the inside of the residence was messy and "looked like someone had gone through the house"; his two

large amount of cash in a bedroom drawer. They secured the house and returned with a warrant; their search yielded additional cash and drugs.

Defendant, charged with multiple drug-related offenses, moved to suppress the evidence. The superior court granted the motion on the ground that that there was insufficient evidence to support a belief that exigent circumstances were present at the time of entry.

The superior court explained: "[T]he [C]onstitution is very clear about how it protects people's home[s]. . . . [T]he law states that exigent circumstances means an emergency situation requiring swift action to prevent imminent escape of a suspect or destruction of evidence. [¶] The testimony which has been presented to me would indicate that these officers were aware that a door had been open all day. That the person[s] who were the occupants of the premises had not been there, and that the place was in shambles. . . . [¶] . . . [¶] I don't feel on the facts of this case, there was sufficient information [that] would justify the officer[s] to believe that an exigent circumstance was taking place at that point. Right then and there or shortly before that a crime had been committed or somebody would be inside that premises who would need their assistance. [¶] It's one of those situations, I think, where it's not uncommon where people leave their doors open."

The Court of Appeal reversed, concluding that, under the circumstances, "the officers reasonably suspected that an exigency existed requiring their immediate warrantless entry." We granted review; I would agree with the trial judge.

## II

The Fourth Amendment to the United States Constitution protects citizens from unwarranted governmental intrusion. It provides that the people are entitled "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." The right is protected against state action by the due process clause of the Fourteenth Amendment.

Security against the government's warrantless search of a private residence is at the heart of the Fourth Amendment's protections. The United States Supreme Court has held that " 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' "

---

contemporaneous reports, however, did not include any such observation. A second officer testified that he did not notice a mess before entering. The superior court implicitly found that the officers did *not* observe the condition of the house as they stood outside the door.

(*Payton* v. *New York* (1980) 445 U.S. 573, 585 [100 S.Ct. 1371, 1379-1380, 63 L.Ed.2d 639].) "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman* v. *United States* (1961) 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734, 97 A.L.R.2d 1277].)

As we have similarly emphasized: "The courts have implicitly recognized that man requires some sanctuary in which his freedom to escape the intrusions of society is all but absolute. Such places have been held inviolate from warrantless search except in emergencies of overriding magnitude, such as pursuit of a fleeing felon [citation] or the necessity of action for the preservation of life or property . . . ." (*People* v. *Dumas* (1973) 9 Cal.3d 871, 882 [109 Cal.Rptr. 304, 512 P.2d 1208], fn. omitted.) "Homes . . . clearly fall within this category of maximum protection." (*Id.* at p. 882, fn. 8.)

Entry into a residence by a police officer is *"per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 474-475 [91 S.Ct. 2022, 2042, 29 L.Ed.2d 564].) Such exceptions are " 'few in number and carefully delineated,' [citation] and . . . the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." (*Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 749-750 [104 S.Ct. 2091, 2097-2098, 80 L.Ed.2d 732].)

In *People* v. *Duncan* (1986) 42 Cal.3d 91, 97 [227 Cal.Rptr. 654, 720 P.2d 2], which also involved warrantless entry into a home, we explained the exception to the Fourth Amendment for searches under exigent circumstances. "We have defined 'exigent circumstances' to include 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property . . . .' [Citation.] The action must be 'prompted by the motive of preserving life or property and [must] reasonably appear[] to the actor to be necessary for that purpose.' [Citation.]

"Thus the exigent circumstances test involves a two-step inquiry: first, factual questions as to what the officer knew or believed and what action he took in response; second, a legal question whether that action was reasonable under the circumstances. [Citation.] On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment. [Citation.] 'As a general rule, the reasonableness of an officer's conduct is

dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' " (*People* v. *Duncan*, *supra*, 42 Cal.3d at pp. 97-98.)

In *Duncan*, a police officer responded to an initial report of a possible burglary in progress at a residence. He found an open window at the back of the house, under which was a box containing a television and other items. We determined that the officer reasonably concluded that the perpetrators might still be in the residence, and that a warrantless entry was thus permitted. (*People* v. *Duncan*, *supra*, 42 Cal.3d at pp. 98-99.) Similarly, in *Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 923 [226 Cal.Rptr. 868, 719 P.2d 242], we held that a warrantless entry was justified when an officer searched a residence after receiving a report of a robbery and observed the defendant wounded and bleeding inside the apartment. We concluded that these facts "reasonably could have led the officer to decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present at the crime scene." (*Ibid.*; see also *People* v. *Hill* (1974) 12 Cal.3d 731, 755 [117 Cal.Rptr. 393, 528 P.2d 1] [warrantless entry was justified based on the report of a recent shooting, bloodstains on the fence and porch, and what appeared to be bloodstains on the floor inside the house]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 378 [303 P.2d 721] [warrantless entry was justified when officers received no response when they knocked on the defendant's door and heard several moans that sounded as if a person inside was in distress].)[2]

By contrast, we have held that a warrantless entry is not permitted when there was no probable cause to believe a crime had occurred or was occurring inside a residence, and officers had no reason to believe a victim or perpetrator was within. Thus, in *People* v. *Smith* (1972) 7 Cal.3d 282, 287 [101 Cal.Rptr. 893, 496 P.2d 1261], we held that a warrantless entry was not justified after a six-year-old girl, found by a neighbor crying outside her apartment, told officers that her mother was not home and no one answered

---

[2]Contrary to the lead opinion's implication, *People* v. *Hill*, *supra*, 12 Cal.3d 731, and *People* v. *Roberts*, *supra*, 47 Cal.2d 374, involved findings of *exigent circumstances*, not that the warrantless entry into a residence was—or could be—justified merely by the fact that police officers were " 'performing a community service or community value.' " (Lead opn., *ante*, at p. 478.) Here, by contrast, the officers "entered only to conduct a security check." (*Ibid.*)

the door when the officers knocked. We observed: "The solicitude of the police for the girl's safety and welfare was of course commendable. But the police must also be concerned with the interest of her parent in the security and privacy of her home, an interest expressly protected by constitutional command. (U.S Const., 4th Amend.; Cal. Const., art. I, § 19.)" (7 Cal.3d, at pp. 285-286.) As the Ninth Circuit Court of Appeals has held: "The fact that a police officer is performing a community caretaking function . . . cannot itself justify a warrantless search of a private residence. . . . [¶] . . . The right to be free from unreasonable searches and seizures does not extend only to those who are suspected of criminal behavior." (*U.S.* v. *Erickson* (9th Cir. 1993) 991 F.2d 529, 531-532.)

Applying the two-step inquiry we prescribed in *People* v. *Duncan, supra,* 42 Cal.3d 91, to this matter, I would reverse the judgment of the Court of Appeal.

Beginning with the factual questions, I conclude that we are bound by the findings of the superior court, which were clearly supported by substantial evidence. In sum, it found that the officers knew that the door had been open all day, the occupants were not home, and the place was a mess; they did not enter to protect persons or property from any imminent threat. "It's one of those situations . . . where it's not uncommon where people leave their doors open."[3]

Turning to the legal question, contrary to the concurring opinion, I conclude that the evidence was properly suppressed. The People failed to carry their burden of proving that the warrantless entry was justified. The officers responded to a report of door left open all day and a messy house; there was no sign that anything had been stolen or that anyone was home.

---

[3]The People point to testimony by the officers that they were concerned "for possibly the life and property on the inside of the house, welfare of the people inside," that the open door was "unusual" in an urban setting, and that 95 percent of their "open door" calls are determined to be burglaries. These statements, no more than "hunches," were entitled to little weight. (*People* v. *Duncan, supra,* 42 Cal.3d at p. 98.) The officers did not state that they entered the house on the *belief* that someone was inside; rather, they explained that they did so to conduct a "security check." The superior court apparently did not conclude from the testimony that the officers actually entered the house in order to forestall any imminent danger to persons or property. " ' "A proceeding under [Penal Code] section 1538.5 to suppress evidence is one in which a full hearing is held on the issues before the superior court *sitting as a finder of fact*." [Citation.]' . . . In such a proceeding the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621], italics added by *Lawler*.) Neither the lead opinion nor the concurring opinion properly defers to the trial court's findings.

The circumstances did not warrant a reasonable belief that entry was necessary to preserve life or property. To the extent that the officers believed they were called upon to perform a community caretaking function, it would have sufficed to shut the door.

### III

The lead opinion agrees that the People did not meet their burden of establishing exigent circumstances warranting the officer's actions: "The officers . . . had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb." (Lead opn., *ante*, at p. 473.) But, rejecting our numerous precedents in point, it reaches out to adopt a new exception to the warrant requirement when the police are acting in a "community caretaking function," that is, when their purpose is to protect persons or property rather than to investigate a crime.

Under the lead opinion's newly created exception, entry is permissible, and incriminating evidence can be seized, when police officers enter a home merely to " 'find out what is going on' " (lead. opn., *ante*, at p. 479)—even though "there is no imminent danger to person or property. The test—whether "a prudent and reasonable officer [has] perceived a need to act in the proper discharge of his or her community caretaking functions" (*id.* at p. 477)—is broad and untethered. Thus, it would appear to apply, as it were, ipso facto whenever the door to a residence is left open: " '[W]hen doors are open, we will hope that [officers] will take steps to find out what is going on . . . .' That is what law-abiding, tax-paying citizens desire and expect of their local constabulary." (*Id.* at p. 479.)

Is it? "[E]ven the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority. . . ." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 530-531 [87 S.Ct. 1727, 1732, 18 L.Ed.2d 930].) Up to now the law has unequivocally provided Fourth Amendment protections against all searches by police officers, regardless of their subjective intentions. Unlike the author of the lead opinion, I am not persuaded that " 'the assistance role of law enforcement . . . in this society will go downhill' " (lead opn., *ante*, at p. 480) unless we adopt their newly devised "community caretaking" exception.

The lead opinion has obscured the " 'firm line at the entrance to the house' that the Fourth Amendment has drawn." (*People* v. *Bennett* (1998) 17

Cal.4th 373, 386 [70 Cal.Rptr.2d 850, 949 P.2d 947], quoting *Payton* v. *New York*, *supra*, 445 U.S. at p. 590 [100 S.Ct. at p. 1382].) Does the lead opinion's new exception also permit entry when a door is merely unlocked? When a neighbor reports that no one is home, or the occupants simply choose not to answer a knock at the door? When something "might be" wrong? The potential for abuse is obvious.

Accordingly, I dissent.