Filed 3/26/15  P. v. Viveros CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAUL VIVEROS,<br><br>    Defendant and Appellant. | F066283<br><br>(Super. Ct. No. VCF242538)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Raul Viveros of the second degree murder of his grandmother, Solidad Hinojos. He argues on appeal that the trial court erred in denying his motion to suppress evidence obtained as a result of his arrest, and the custody credits in the abstract of judgment are incorrect by one day, probably because he was incarcerated during a leap year. Viveros also requests we review various police reports that were produced in response to subpoenas issued by defense counsel. The trial court reviewed these records and concluded none of the reports should be given to Viveros. We conclude the trial court correctly denied Viveros's motion to suppress and correctly concluded none of the police reports was relevant to this proceeding. We will remand the matter to the trial court for issuance of a corrected abstract of judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### *Evidence Presented at Trial*

On the day of the murder, Ernesto Llerenas lived in the same house with his mother, his brother, Viveros, and Ms. Hinojos. Although Llerenas had remained in his bedroom most of the day, he heard Viveros and Ms. Hinojos leaving and returning to the house several times that day. Around 7:00 or 8:00 p.m., Llerenas awoke from a nap when he thought he heard a scream, although it was not a scream suggesting someone was seriously injured. He then heard a door slam, which caused him to wake up fully. Llerenas got dressed and went to the living room, where he observed Ms. Hinojos sitting on the floor in front of the couch covered in blood. Llerenas ran back to his room and called first his brother and then the emergency operator to report the crime.

Tulare City Police Officer Shannon Oliver was one of the first officers to arrive at the scene. She found Llerenas and his brother outside the house. After detaining the two, she and another officer cleared the house. Ms. Hinojos was in the living room. As soon as the officers determined the house was safe, emergency personnel entered to treat Ms. Hinojos.

Tulare City Police Corporal Richard Payne was the detective assigned to the murder. He arrived at the scene at approximately 8:50 p.m. During his initial investigation he discovered Ms. Hinojos owned a vehicle and that Viveros lived with her at the house. Since neither the vehicle nor Viveros could be located, he issued a statewide alert for both. At approximately 5:00 a.m. the following morning, the vehicle was located abandoned on southbound Highway 99, five miles south of Bakersfield.

California Highway Patrol (CHP) Officer Joshua Williams was assigned to the Grapevine inspection facility (hereafter, facility or weigh station) on Interstate 5 south of Bakersfield. The facility weighs and inspects commercial vehicles. Normally there is no foot traffic at the facility.

In the early morning hours on the day after the murder, Williams observed an individual in dark clothing walking across one of the scales used to weigh commercial vehicles. Williams stopped the pedestrian, who he later learned was Viveros, because it was not safe for a pedestrian to be in that area. Viveros pointed in a southerly direction and said he was headed that way. Williams brought Viveros into the facility and had him wait in the truck drivers' waiting area. Williams intended to gather more information so he could assist Viveros. Viveros appeared confused and was not sure where he was or where he was headed. Viveros told Williams the vehicle he was driving ran out of gas. When asked if someone could pick him up, Viveros said he did not know anyone and there was no number he could call for assistance.

Williams then had Officer Francisco Torres perform a records check on Viveros. The records check did not reveal any negative information. Torres then contacted the CHP dispatch center in an attempt to obtain a phone number for Viveros. The dispatcher reported that Viveros was wanted in Tulare, at which time Viveros was detained.

Initially, Williams's primary concern was Viveros's confused state. Had Viveros not been confused, Williams would not have released him at the weigh station, but would have offered him a ride to a nearby restaurant.

3.

Torres testified that because Viveros appeared confused and disoriented, he checked Viveros for possible drug intoxication. Torres concluded Viveros was not under the influence of drugs at the time. Torres also found it strange that Viveros ended up at the facility because it is in a very remote location and it was unusual for any pedestrian to appear at the facility. Torres contacted dispatch to try to find a contact number because it would not have been safe for Viveros to leave the facility on foot as it was located in such a remote place. Viveros was at all times cooperative with both officers.

Ms. Hinojos was stabbed approximately 55 times. One cluster of stab wounds was suffered on the left side of Ms. Hinojos's face, which resulted in fractures of the facial bones. Ms. Hinojos also suffered four stab wounds to the left side of her chin and neck, 14 stab wounds to the right side of her face and neck, eight stab wounds to the chest area, some of which penetrated the heart, and there were also stab wounds to the abdominal and upper left back areas. The stab wounds to the heart caused Ms. Hinojos to bleed to death, although a preexisting heart condition aggravated by the stab wounds may have contributed to her death.

Samples for DNA testing were taken from Ms. Hinojos's fingernails and mouth. Samples for DNA testing were taken from Viveros, including fingernail scrapings. Finally, samples from the clothes Viveros was wearing and the key to the vehicle he was driving were taken for DNA testing.

Samples obtained from Viveros's sandals that appeared to be blood contained DNA that was consistent with Ms. Hinojos's DNA.[1] A sample from the key that appeared to contain blood also contained Ms. Hinojos's DNA profile. A sample taken from Viveros's jeans that appeared to be blood contained a DNA profile consistent with Viveros's DNA.

---

[1]Statistically, the DNA from a nonrelated, randomly selected individual would be one in five quintillion Hispanics.

*The Information*

The information charged Viveros with one count of first degree murder. (Pen. Code, § 187, subd. (a).)[2] In addition, it was alleged Viveros used a deadly weapon within the meaning of section 12022, subdivision (b)(1).

*Verdict and Sentencing*

The jury found Viveros not guilty of first degree murder, instead finding him guilty of the lesser included offense of second degree murder. The jury also found true the deadly weapon enhancement. Viveros was sentenced to a term of 15 years to life plus one year for the enhancement.

## DISCUSSION

### I. Detention

Prior to trial Viveros made a motion pursuant to section 1538.5 to suppress all evidence obtained as a result of his arrest at the CHP weigh station. He argued he was illegally detained and any evidence seized was fruit of the poisonous tree. The trial court denied the motion to suppress after conducting a hearing. Viveros asserts the trial court erred and reversal is required.[3]

*Standard of Review*

""An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's

[2]All further statutory references are to the Penal Code unless otherwise stated.

[3]Under a separate heading, Viveros argues that to the extent his arguments were not preserved by defense counsel, he received ineffective assistance of counsel. Finding no merit to his arguments, we conclude defense counsel was not ineffective.

5.

resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law,… is also subject to independent review."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 255.)

The Fourth Amendment prohibits unreasonable searches and seizures. If Viveros had been detained, the principles of the Fourth Amendment would be implicated, as a detention is a type of seizure. (*Terry v. Ohio* (1968) 392 U.S. 1, 9, 16 (*Terry*).) And if the detention was unlawful, any evidence seized as a result of the detention would be excluded from evidence at trial. (*Id*. at pp. 12-13.) To determine if the seizure was reasonable under the Fourth Amendment, we must determine if the police officer's action was justified at its inception and whether it was reasonably related in scope to the circumstance that justified the interference in the first place. (*Terry,* at p. 20.)

> "In order to assess the reasonableness of [an officer's] conduct as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' [Citation.] And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? [Citations.] Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

6.

[Citations.] And simple "'good faith on the part of the arresting officer is not enough." … If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects," only in the discretion of the police.'" (*Terry, supra,* 392 U.S. at pp. 20-22, fns. omitted.)

Not all encounters between police officers and citizens, however, are deemed seizures for Fourth Amendment purposes. "As the United States Supreme Court has explained: "'[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons."' [Citation.] In this context, a seizure occurs only 'when the officer, "'by means of physical force or show of authority,'" terminates or restrains [a person's] freedom of movement [citation] *through means intentionally applied …*" [citation].' [Citation.] The dispositive question is whether, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave …" [citation].' [Citation.] '[W]hen a person "has no desire to leave" for reasons unrelated to the police presence, the "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter …" [citations].' [Citation.] The test is 'objective,' not subjective; it looks to 'the intent of the police as objectively manifested' to the person confronted. [Citation.] Accordingly, an 'officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant .…'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

If the encounter is not consensual, then it generally will fall within one of two categories of seizures. The first is a detention, which "involves a seizure of the individual for a limited duration and for limited purposes. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.'" (*People v. Bailey* (1985) 176 Cal.App.3d 402, 405.) The second type of seizure is an arrest, where the police must have probable cause to arrest a person for a crime. (*Ibid*.)

"Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.] [¶] The United States Supreme Court has made it clear that a detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur. [Citations.] '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

One additional Fourth Amendment concept is relevant here. "In the average day, police officers perform a broad range of duties, from typical law enforcement activities— investigating crimes, pursuing suspected felons, issuing traffic citations—to 'community caretaking functions'—helping stranded motorists, returning lost children to anxious parents, assisting and protecting citizens in need—'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" (*People v. Ray* (1999) 21 Cal.4th 464, 467 (*Ray*).) *Ray* addressed the issue of whether police officers were engaging in their community caretaking functions when they entered

8.

the defendant's residence because it appeared a burglary was in progress. While in the residence, the officers observed large amounts of cocaine and cash. Based on these observations, a search warrant was obtained. The evidence seized resulted in the defendant's conviction of various crimes.

The defendant argued the evidence should have been suppressed because it was discovered during a warrantless search. The issue was whether the officers were acting pursuant to their community caretaking function during the initial entry. The Supreme Court explained the parameters of the community caretaking exception to the Fourth Amendment, but primarily focused on the applicability of the exception to warrantless entry into residences. However, certain principles enunciated by the Supreme Court are applicable here.

First, the Supreme Court recognized the concept was fact dependent. "Nonetheless, '[w]hile categorizing these different activities under the heading of "community caretaking functions" may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard. Community caretaking activities are varied and are performed for different reasons.' [Citation.] Each variant must be assessed according to its own rationale on a case-by-case basis. 'Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place.'" (*Ray, supra,* 21 Cal.4th at p. 472.)

Second, the concept encompasses the protection of both persons and property. "Under the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry, including the protection of property, as 'where the police reasonably believe that the premises have recently been or are being burglarized.' [Citation.] 'Although the case law attaches slightly greater weight to the protection of persons from harm than to the protection of property from theft, many of the cases involving possible burglaries or breakings and enterings stress the dual community

9.

caretaking purpose of protecting both. [Citations.]' [Citation.]" (*Ray, supra,* 21 Cal.4th at p. 473.)

The Supreme Court also explained the concept was not a pandora's box that could be used to justify any warrantless search. "The appropriate standard under the community caretaking exception is one of reasonableness: Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions? Which is not to say that every open door— even in an urban environment—will justify a warrantless entry to conduct further inquiry. Rather, as in other contexts, 'in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.'" (*Ray, supra,* 21 Cal.4th at pp. 476-477.) However, "[w]hen officers act in their properly circumscribed caretaking capacity, we will not penalize the People by suppressing evidence of crime they discover in the process." (*Id.* at p. 479.)

### *The Suppression Hearing*

Williams was the first witness to testify. He explained the weigh station is on the southbound side of Interstate 5. The officers generally check commercial trucks for mechanical violations, weight violations, or other readily observable traffic violations (such as seatbelt violations). There are only empty fields near the weigh station and a truck stop approximately one mile north. Based on the location of Ms. Hinojos's vehicle and Viveros's subsequent statements to Williams, Viveros must have walked by the truck stop to get to the weigh station. Pedestrians are not permitted on the highway.

At 3:40 a.m. Williams observed Viveros walking southbound in front of the window of the weigh station. Williams exited the weigh station building, stopped Viveros, and asked him for his identification and where he was going. Williams became

concerned because it was unusual for anyone to be walking in the direction in which Viveros was headed. It also was unsafe to be on foot because trucks were constantly moving through the area. The weigh station is considered part of the highway.

Viveros presented Williams with his identification, which was not a driver's license. Viveros stated he ran out of gas approximately one to two miles north of the weigh station. He also stated he had been walking for three hours. Williams asked Viveros to come inside the weigh station so they could attempt to find him a ride. Viveros appeared confused. He could not explain where he was; he did not know what city he was in; and he did not know what direction he was headed. Viveros was able to point to the south when asked where he wanted to go. Williams testified that at that point Viveros was detained because of his confusion and it would have been unsafe and illegal to release Viveros to walk onto the freeway.

Williams brought Viveros into the facility and had him sit in the public area of the facility (where waiting truck drivers sit). Because Viveros was confused, Williams thought he might be intoxicated. He performed field sobriety tests on Viveros and concluded he was not under the influence of drugs.

Williams next asked Torres to run Viveros's name through the Department of Motor Vehicles database. He also asked Viveros for a contact phone number to get him a ride somewhere. Williams was going to either give Viveros a ride somewhere or have someone pick him up. Williams was not going to release Viveros to walk on the freeway. At this point, approximately 30 minutes had passed since Williams first encountered Viveros. Torres then called CHP dispatch and Viveros was arrested two to three minutes later.

Truck drivers could have given Viveros a ride, but none offered to do so. If Viveros had stated he wanted to ask a truck driver for a ride, Williams probably would have released him after the DMV check was completed. Williams would not have let Viveros walk away because it was unsafe.

11.

Torres testified he was sitting with Williams watching the trucks pass through the weigh station when Viveros walked directly in front of them. It was unusual for a pedestrian to be in the area because it is so remote. Williams stepped outside and contacted Viveros. When Viveros entered the weigh station building, he appeared to Torres to be lost and confused. He did not know where he was and was not making sense. Torres was concerned for Viveros and believed someone needed to pick him up or an officer would have to transport him to a safe location. Torres contacted CHP dispatch and asked them to check into the information presented by Viveros in an effort to locate someone who could help Viveros. Dispatch advised Torres that Viveros was a suspect in a murder that had occurred in Tulare. Torres then placed Viveros in handcuffs.

Defense counsel argued that once the officers determined Viveros was not intoxicated, he should have been released. She asserted there were no grounds for detaining him at that point, and the officers were speculating that Viveros would have walked onto the freeway. She requested the trial court suppress the items obtained from Viveros, including the keys and his clothing. The prosecutor argued the officers acted reasonably and to release Viveros in the condition he was in would have been irresponsible. The trial court concluded the detention was not prolonged and denied the motion.

*Analysis*

Viveros argues Williams did not have a reasonable suspicion that Viveros was engaged in wrongdoing at the time of the initial contact. And, even if the initial contact was justified, Viveros should have been released once Williams determined Viveros was not under the influence of alcohol or drugs and the DMV check did not return any negative information about Viveros. Any detention after that point, according to Viveros, violated his Fourth Amendment right to be free from unlawful seizures. The People, on the other hand, argue the initial encounter between Williams and Viveros was consensual, and any subsequent detention was justified under the circumstances.

12.

While it seems doubtful the initial encounter between Viveros and Williams was a detention, we do not need to resolve that issue. Even if we were to assume Viveros was detained throughout this encounter, the totality of the circumstances establish the Fourth Amendment was not violated.

We reiterate the pertinent facts. Viveros was walking on Interstate 5 in a remote area at 3:40 a.m. He wandered into the weigh station, which is part of the freeway, disoriented and confused. He was so disoriented the officers felt compelled to perform a field sobriety test to determine if Viveros was under the influence of alcohol or drugs. Viveros could not provide a rational explanation for his presence at the weigh station,[4] could not provide any contact information for someone that could come to his assistance, could not explain where he was headed, and could not form a plan to obtain a ride from the weigh station.

Williams had two grounds for detaining Viveros at this time. First, Viveros was violating the Vehicle Code because he was walking on a highway (for which a citation can be issued). (Veh. Code, §§ 21461.5, 21960.) Second, the officers' community caretaker function demanded they ask Viveros to come into the weigh station building for his own safety. Anyone as dazed and confused as Viveros would be in serious danger of harm if permitted to wander around the commercial vehicles that are required to proceed through the weigh station.

Arguably, the reason to detain Viveros ended once Williams determined Viveros was not intoxicated. But Viveros had nowhere to go. He could not proceed on the highway; he did not state he would walk only on open property to reach his destination;

---

[4]Viveros explained his presence at the weigh station by claiming he ran out of gas. He also stated, however, that he ran out of gas one to two miles north of the weigh station. This statement was entirely inconsistent with his statement that he had been walking for three hours. The totality of these statements amply demonstrates that Viveros indeed was disoriented and confused.

13.

he did not have a ride; and he was unable to identify anyone who could pick him up. Nor was there any evidence he asked, or attempted, to leave. He was sitting in the public area of the weigh station building and was not restrained in any manner. From all appearances, he simply was waiting for the officers to provide him with transportation to somewhere safe. Because Viveros placed himself in the position of being unable to leave because he had neither a vehicle to drive nor another individual willing to take him from the scene, the officers' community caretaker function compelled them to keep Viveros safe by leaving him inside the building until a ride could be found for him, or one of the officers had the opportunity to give him a ride to a safe location.

Viveros argues otherwise. He claims he merely was walking when Williams approached, which is true. He also asserts he was walking off the highway. This is not an accurate depiction of the circumstances. Viveros was walking in a commercial weigh station where it was unsafe for pedestrians to be traveling. That Williams approached out of concern for Viveros's safety not only was appropriate but commendable.

We also disagree with Viveros's assertion that he had a reasonable explanation for traveling on foot. Nothing about his explanation was reasonable. Running out of gas perhaps was not unusual, but to assert you traveled one to two miles in three hours of walking was not reasonable. Not knowing where you are located or where you are headed is not reasonable. Walking into a commercial weigh station at 3:40 a.m. is not reasonable.

Viveros contends that Williams should have sent him on his way with a warning to be careful of traffic. Contrary to Viveros's contention, Williams testified the weigh station is part of the highway. Moreover, he testified it would not have been safe to let Viveros walk away from the weigh station. Sending Viveros on his way with a warning simply was not realistic, especially considering Viveros's disoriented and confused state.

Also unreasonable is Viveros's assertion that Williams should have dropped everything and given Viveros a ride to a place of safety. Williams testified that giving

14.

Viveros a ride to a place of safety was an option. Officers, however, cannot abandon the weigh station to provide transportation to a pedestrian who should not be there in the first place.

Moreover, the officers were attempting to find a ride for Viveros when they discovered he was wanted for the murder of Ms. Hinojos. Since Viveros placed himself in the position of having to rely on someone else to provide him with transportation, he cannot now complain that had this generosity been provided more promptly he would not have been caught. The parameters of the Fourth Amendment do not stretch nearly so far.

Viveros placed himself in a position where the only safe way to proceed was to obtain a ride. Since Viveros was not able to obtain a ride on his own, was not able to provide information that would lead to someone picking him up, and could not leave safely or legally on foot, Viveros was forced *by the circumstances*, not by the officers, to wait until he could be given a ride. Under the totality of these circumstances, Viveros's Fourth Amendment rights were not violated.

## II. Subpoenaed Documents

Defense counsel subpoenaed various police reports related to (1) a crime allegedly committed by Viveros's brother, (2) an incident involving a relative of one of the occupants in the house, and (3) reports of burglaries in the area surrounding the house where the murder occurred. The records were produced by the responding agencies under seal. Defense counsel filed declarations under seal explaining the possible relevance of the documents. The trial court reviewed the records in camera and determined the documents were not discoverable because none of them supported the theories advanced by defense counsel.

Viveros requested we review these documents to determine whether the trial court erred in denying discovery of them. The People agreed with this request. Accordingly, we have reviewed the declarations filed by defense counsel, the subpoenas served by defense counsel, the confidential documents contained in the record, and the confidential

15.

transcripts of the in camera proceedings. Our review confirms that none of the documents produced supported any of the theories advanced by defense counsel. Nor could they be considered relevant to any issue in the case. Hence, the trial court did not err in refusing discovery of the police reports.

## III.    Abstract of Judgment

Finally, Viveros contends there is an error in the abstract of judgment that should be corrected. He points out he was arrested on September 23, 2010, and sentenced on November 6, 2012. Accordingly, Viveros's total time in custody before sentencing is 776 days. The trial court awarded Viveros 775 days of actual custody credits and the abstract reflects the same number. The People concede the abstract should be corrected to reflect this correct number of days of custody credits. Therefore, we will remand the matter to the trial court to issue a corrected abstract of judgment.

## DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court for issuance of a corrected abstract of judgment. A copy of the corrected abstract of judgment shall be forwarded to all appropriate agencies.

_____
CORNELL, Acting P.J.


WE CONCUR:


_____
GOMES, J.


_____
PEÑA, J.


16.