Filed 1/4/16  P. v. Gabor CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B258468 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA089335) |
| v. | |
| HESHAM MAHER GABOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Reversed.

Brentford J. Ferreira for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Hesham Gabor of felony resisting an executive officer by violence (count 1; Pen. Code, § 69)[1] and misdemeanor resisting, delaying or obstructing a peace officer (count 2; § 148, subd. (a)(1)). Both counts arose from events that transpired inside Gabor's home. We reverse the judgment because a series of rulings by the trial court resulted in a failure to properly instruct the jury on a common element of the charged offenses, namely, that the police officer was "performing his *lawful* duty" (§ 69) at the time of the resisting conduct, and that the police officer was "*lawfully* performing . . . his duties" (§ 148, subd. (a)(1)) at the time of the resisting conduct. This failure prevented the jury from deciding this element of the case.

## FACTS

On Sunday, March 17, 2013, at about noon, Pasadena Police Department (PPD) Officer Eric Butler drove to Wallis Street after a citizen approached him while he was parked in his patrol car and told him she had seen a young boy, approximately six years old, who seemed to need help. On arriving at the scene, Officer Butler saw a boy matching the citizen's report sitting on a retaining wall in front of a town home. The boy turned out to be Gabor's then 10-year-old son, Andrew.

Officer Butler parked his police car, walked toward Andrew, and asked if he needed help. Andrew replied, "Yes." He appeared to be shaking and crying. Andrew stated that his parents had locked him out of the house. When Officer Butler asked why his parents did that, Andrew responded that he did not know. As he was talking to Andrew, Officer Butler saw another child, who turned out to be Andrew's then seven-year-old brother, Paul, looking out a window next to the front door.

Officer Butler asked Paul to open the door, and Paul complied. Andrew then entered the home and Officer Butler followed him into an entrance area by the front door threshold. Officer Butler asked Paul if he had heard his brother banging on the front door. Paul answered that he heard, but did not open the door because his father told him not to. When Officer Butler asked the children about their father's whereabouts, Paul

---

[1]     All further undesignated section references are to the Penal Code.

indicated their father was taking a shower. Officer Butler asked Paul to go get him. Paul left and returned a few moments later. When the children's father did not come out promptly, Officer Butler asked Paul to go a second time and let his father know that a police officer was at the door. Paul left and returned again, but the father still did not come to the front door area. At this point, Officer Butler asked Paul if his father was okay, and Paul answered, "Yeah, he's fine." Officer Butler asked the question about the father's well-being because Officer Butler "wasn't sure if [the father] fell, if there was an accident . . . [or] if he were on medication." Officer Butler asked Paul a third time to get his father, and Gabor then entered the living room.

Officer Butler introduced himself as a police officer, and asked Gabor who he was, but Gabor did not answer. He appeared to be angry. Officer Butler explained that Andrew was locked outside and someone heard him banging on the door and yelling to be let inside. Gabor said he had been in the shower, and acknowledged he had known his son was outside. When Officer Butler asked Gabor why he had not done anything about his son being outside, Gabor answered, "Go ask his mother and get out of my house."

Rather than departing the house as directed, Officer Butler told Gabor that leaving his son outside appeared to be neglectful, to which Gabor replied, "No, it's not. Get out of my house." Officer Butler, in turn, asked Gabor why he was angry, and Gabor answered, "I'm angry because you are in my house. Now get out of my house." Gabor then stepped into the kitchen for a few seconds and returned holding an object behind his leg.[2] Officer Butler became concerned for his safety asked Gabor to step outside of the house to talk. Gabor refused and told the officer, "Whatever you need to say, you can say it right here." When Gabor went into the kitchen again, Officer Butler said, "Can you please not leave. I need to speak with you." Gabor returned with his hands in his pockets. Officer Butler again told Gabor that leaving his son outside was neglectful, and, again, asked Gabor to step outside to talk. Again, Gabor declined.

---

[2]     The object turned out to be a phone.

3

Gabor then kicked Andrew's foot, and told him, "You see how they are? This is what they do." Officer Butler felt uncomfortable because of Gabor's conduct. He called for backup and activated a tape recorder device he had with him.[3] Andrew then asked Officer Butler to leave. When Officer Butler asked Andrew why, Andrew stated that he was afraid because Officer Butler had a gun and "shoots people."

Meanwhile, the front door was still open. Gabor walked to the door and shut it. Officer Butler reopened the door and told Gabor it had to remain open because his partner was arriving. Gabor closed the door a second time after stating he had allergies.

At this point, Officer Butler, in his own words, "pushed" Gabor against the wall and repeated his command that the door must remain open. The two started "jostling" over closing and opening the door. After about the fourth time the door was closed and opened, Officer Butler grabbed Gabor's wrist and ordered him to place both hands behind his back. Gabor refused to comply and, instead, clutched his hands together and dropped down. Officer Butler could not pull Gabor's hands behind his back. Gabor refused to comply with the officer's repeated commands that he "surrender." Officer Butler grabbed Gabor's head and steered him away from the wall. Officer Butler positioned himself behind Gabor and "forced" him to the ground. Gabor started using his legs to push off the wall. During the ensuing struggle, Gabor clasped his hands together and refused to lie flat on the ground and put his hands behind his back. Officer Butler was unable to gain control of Gabor's hands. Gabor told Andrew to call 911 and say that a police officer was choking him. Gabor told Officer Butler, "Look what a good example you are. You are showing what the police are doing." Gabor tried to hit Officer Butler with a phone, but Officer Butler knocked the phone out of Gabor's hands. Officer Butler "applied pressure points" to Gabor's body to force compliance, but none of them worked. Officer Butler maintained his position on top of Gabor and waited for backup to arrive.

---

[3]     The recording was played for the jury. We have listened to the tape recording.

4

A few minutes later, PPD Corporal Jayce Ward, one of Officer Butler's superiors, arrived at the Gabor home. Corporal Ward saw Officer Butler pulling on Gabor's arm and ordering him to give it up. Corporal Ward placed his knee on Gabor's back and grabbed his other arm. Gabor ignored both officers' repeated commands to release his hands.

Eventually, Corporal Ward tried to squeeze Gabor's trapezius muscle to force him to give up. Gabor started to rock back and forth more aggressively until Corporal Ward lost his balance. Corporal Ward straddled Gabor's shoulders with his knees to limit Gabor's movements. After several failed attempts to pull Gabor's hands from underneath him, Corporal Ward ordered Officer Butler to use his taser as a "drive stun," a technique that applies an electric shock to the area the taser directly touches on a body. After giving Gabor a warning that he ignored, Officer Butler applied a stun to Gabor's leg, which forced Gabor to release one of his hands. Corporal Ward told Gabor he would be stunned again unless he gave up his other hand. When Gabor refused, Officer Butler applied a second stun that caused Gabor to release his other hand. At that point, the officers were able to handcuff Gabor. As the officers escorted Gabor to a patrol car, he jerked his shoulders back and forth in an attempt to break free.

During his testimony on direct examination, Officer Butler explained why he entered the Gabor home by describing his understanding of the situation as it existed at the time of the entry. His specific explanation was as follows:

> "[I entered the home s]o I can actually see get a better view of what was going on and if I had stayed outside whomever was in the house could have easily closed the door and that would have been it. I wouldn't — I didn't have enough, for example exigency to enter the home. I didn't have consent, really. So, if whomever would shut the door, then I would have to go through different channels to try to further the investigation."

On numerous occasions during his testimony, Officer Butler indicated he entered the home to investigate a possible child endangerment situation.

Gabor testified in his own defense. He explained his wife and Andrew left in the morning to go to their other house that was being remodeled at the time. He locked the door after they left and went to take a shower. A short time later, Paul came inside and informed him that a police officer was inside the house. According to Gabor, the physical events between him and Officer Butler began when Gabor asked the officer to close the front door because of his allergies.[4] Officer Butler said he wanted the door open because his partner was about to arrive. Gabor said they could open the door once his partner arrived and went to close the door. As Gabor placed his hand on the door to close it, Officer Butler told Gabor the door needed to remain open, then suddenly pushed Gabor against the wall. Officer Butler grabbed Gabor by the neck and began choking him. Gabor feared for his life. Officer Butler took Gabor to the ground and forced himself on top of Gabor's body. Gabor could not remember much of what happened afterwards, except for a vague recollection of being tased.

The People filed an information charging Gabor with felony resisting an executive officer (count 1; § 69) and misdemeanor resisting a peace officer (count 3; § 148, subd. (a)(1)). The information initially included a count alleging child endangerment (count 2; § 273a, subd. (b)), but that count was dismissed before trial. The case was tried to a jury, at which time the prosecution presented evidence establishing the facts summarized above, primarily through the testimony of Officer Butler and Corporal Ward.

The jury returned verdicts finding Gabor guilty on both counts. The trial court placed Gabor on three years' formal probation, with terms and conditions, including an order that he attend anger management and parenting classes.

---

**4** Another defense witness testified that Gabor suffered from long-term allergy problems.

**DISCUSSION**

**I. The Trial Court Erred in Foreclosing Questioning, Argument, and Jury Instruction on the Lawfulness of the Police Officer's Entry and Stay in the Family Home**

Gabor contends his convictions must be reversed because the trial court erred in refusing to allow his counsel to question witnesses on the subject of whether Officer Butler's entry and stay in the family home was unlawful, refusing to allow argument on the subject, and failing to give complete instructions applicable to the subject. The parties agree that to convict the defendant of the offenses charged in this case, the People were required to prove that Officer Butler was in the performance of his duty at the time and that his actions were lawful. They further agree that, because Gabor was arrested inside his home, it was the People's burden to show the officer's entry into and stay in the home comported with the Fourth Amendment. Gabor contends the prosecution should have been limited to justifying the warrantless entry into his home based on the exigent circumstances exception, and that the jury should have been instructed accordingly. As a fall-back position, he argues that to the extent the prosecution was permitted to justify the entry into his home based on the so-called "community caretaking" exception to the warrant requirement, the trial court's instructions were inadequate in that they failed to explain the exception for the jury. The People accept the general principle that the officer had to have an antecedent right to be in Gabor's home which comports with the Fourth Amendment for Officer Butler to be lawfully performing his duties. The People do not assert the exigent circumstances exception is applicable and the prosecution never offered that exception as a justification for entry into Gabor's home at trial. Instead, the People argue the community caretaking exception to the Fourth Amendment justified the warrantless entry and stay in Gabor's home.

Because the trial court itself determined the officer's entry and stay in the house was lawful, and that this was not an issue for the jury to determine, and because the court refused to instruct the jury on the issue of lawful entry and restricted questioning and argument on the issue, we agree with Gabor that the trial court prejudicially erred.

7

*Background*

After the last witness testified, Gabor's counsel moved for entry of a judgment of acquittal pursuant to section 1118.1 on the ground that the evidence did not establish Officer Butler had "lawfully" entered the Gabor home, and thus, did not establish he had been lawfully discharging a duty of his office.[5]  Gabor's counsel argued that the prosecution failed to prove the element that Officer Butler had been lawfully performing his duty at the time of the resisting conduct because the prosecution failed to present evidence which would support either of two possible exceptions to the Fourth Amendment's warrant requirement for entry into a residence, namely, the exigent circumstances or the community caretaking exceptions.  The court denied the motion, finding that "a reasonable jury could find [Gabor] guilty on these facts . . . ."[6]  Reading the court's ruling in the context of the 1118.1 motion, as well as ensuing matters, we understand that the court denied the 1118.1 motion upon finding there was sufficient evidence to support application of the community caretaking exception to the Fourth Amendment's warrant requirement.

Immediately after the 1118.1 ruling, the court raised another issue that it wanted to discuss with the lawyers:  "My concern is how we approach this 'in-the-house doctrine' because I'm afraid that it may be confusing to the jury, and I want to make sure that the arguments don't further confuse the topic . . . ."  During the ensuing exchanges, the court and the lawyers discussed what role the jury should play in determining whether Officer Butler had lawfully entered and or remained in the Gabor home.  Gabor's counsel argued that the court should not "direct a verdict on a particular issue," and "should instruct . . . on the community caretaking exception" to the Fourth Amendment's requirement that a police officer needs a warrant to enter a person's home.  Gabor's

---

[5]     Gabor's counsel cited several cases addressing when a police officer may lawfully enter a person's home without a warrant as the entry concerns the lawfulness of a search, but no cases directly addressing the elements of a charge under section 69 or section 148, subdivision (a)(1).

[6]     The trial court's ruling on the 1118.1 motion is not challenged on appeal.

8

counsel additionally contended the defense was "entitled to make an argument along the following lines: '[T]he judge has instructed you on the law of the community caretaking exception. Whether or not that was applied in a reasonable manner in this particular case is for you to decide. If you decide that the officer's conduct was unreasonable in invoking that standard, you should find the defendant not guilty.' " The court responded that it was not as concerned about giving an instruction on the community caretaking exception as it was about counsel arguing to the jurors that it was their role to decide whether Officer Butler had entered the Gabor house lawfully or unlawfully.

After a series of further exchanges, the trial court ruled: "I find that [the officer] was there lawfully. I believe that he was conducting his community care function with a seven-year-old and a 10-year-old to determine whether or not they had a parent there at the house. . . ." Following another series of exchanges, the court reiterated its ruling: "In the court's determination, the officer was in the location lawfully." The court then explained to Gabor's counsel the scope of his permissible argument: "Whether or not [the officer's] actions were reasonable is a different story. . . . His actions you can talk about, but you cannot talk about the location . . . . If he did something that was unreasonable, which is what the law is talking about, were the officer's actions in making the arrest unreasonable." The court's ruling prompted Gabor's counsel to move for a mistrial, which the court denied.

The discussions then continued, with the trial court once more restating its ruling: "I've heard the evidence and I determined — I am using the standard set forth in the [cases addressing the] community caretaking [exception] — that I believe that the officer was at the location lawfully. Now the question is how do I modify the instruction?" The court then asked whether the parties agreed that it could instruct the jurors that the court had determined the officer was at the location lawfully. Gabor's counsel responded: "I am going to ask the court not to instruct on that because that is a finding." The prosecutor agreed with Gabor's counsel. Ultimately, the court stated the instructions would inform the jury only that a community caretaking function was one of Officer Butler's duties. When Gabor's counsel asked whether the court would define the

9

community caretaking function, the court replied: "No, I'm not going to go in and try to define what it is. Because if I try to define what it is, then I am inviting them to make an analysis on it. I think that what they are supposed to be looking at is the function of the arrest because that is what the 148 is, did [the defendant] obstruct or resist or delay the officer in his duty. And then when the officer was making the arrest, did [the defendant] resist by force."

At the close of trial, the trial court instructed the jury with CALCRIM No. 2652 — defining the elements of felony resisting an executive officer in the performance of the officer's duty in violation of section 69; CALCRIM No. 2656 — setting out the elements of misdemeanor resisting a peace officer in violation of section 148, subdivision (a); and CALCRIM No. 2670 — defining the lawful performance of duties by a peace officer. In connection with both CALCRIM No. 2652 and CALCRIM No. 2656, the court instructed the jury as follows:

> "The duties of a Pasadena police officer include investigating possible criminal activity, detaining persons that they have a reasonable suspicion have committed criminal offenses, and arresting an individual when probable cause exists. Amongst those duties is the community caretaking function.
>
> "A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties. Instruction 2670 explains when an arrest or detention is unlawful or when force is unreasonable or excessive."

### Applicable Legal Principles

A trial court is required to instruct on general principles of law that are applicable to the facts shown by the evidence and that are necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Because the prosecution has the burden of proving beyond a reasonable doubt each element of a charged offense, an instructional error which relieves the prosecution of its burden violates the defendant's constitutional right to due process. (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.)

10

Further, a trial court must instruct on defenses that are consistent with the evidence. (*People v. Montoya, supra*, 7 Cal.4th at p. 1047.)

Under the statutory language of section 69, the prosecution must prove as an element of the offense that a police officer was "performing his *lawful* duty" at the time of a defendant's resisting conduct, and, under the statutory language of section 148, subdivision (a)(1), the prosecution must prove as an element of the offense that the police officer was "*lawfully* performing . . . his duties" at the time of the defendant's resisting conduct. Under "longstanding" case authority, a defendant cannot be convicted of an offense against a peace officer engaged in the performance of his or her duties "unless the officer was acting lawfully at the time the offense against the officer was committed." (*In re Manuel G.* (1997) 16 Cal.4th 805, 815.) This rule "flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.)

The United States Supreme Court first used the term "community caretaking" in *Cady v. Dombrowski* (1973) 413 U.S. 433 (*Cady*) to justify a warrantless search of an automobile. There, a driver was involved in an accident and police towed the car to a private garage. The officers had reason to believe a firearm could be in the trunk. (*Id.* at pp. 436-437.) The events occurred in a rural area. After the car was dropped off, the police searched the trunk and found a revolver which was later connected to a murder. The Supreme Court ruled that the warrantless search of the trunk of the towed car was lawful because of safety concerns for the general public who might be endangered in the event an intruder out in the remote area removed a gun from the trunk of the vehicle. (*Id.* at p. 447.) The result may have been different in a metropolitan area, the high court suggested, where a police officer could have been posted near the vehicle. (*Ibid.*) The Court noted that officers often must "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (*Id.* at p. 441.)

11

The community caretaking function has also been discussed by the high court in *South Dakota v. Opperman* (1976) 428 U.S. 364 (*Opperman*), and *Colorado v. Bertine* (1987) 479 U.S. 367, both of which involved searches of automobiles. The federal courts of appeals construing *Cady* have struggled to reach a consensus on its scope. (See discussion in *Ray v. Township of Warren* (3d Cir. 2010) 626 F.3d 170 [lawsuit for violation of civil rights pursuant to 28 U.S.C. § 1983 based on alleged unconstitutional search].) The majority of the courts of appeals have concluded that *Cady*'s community caretaking exception to the Fourth Amendment cannot be invoked to justify a warrantless entry into a person's *home*. (*Ray v. Township of Warren, supra,* at pp. 175-177.) Some of the cases have ruled that the community caretaking exception to the Fourth Amendment's warrant requirement are limited to automobile searches. In the evidence suppression context, state courts have also reached mixed conclusions as to whether *Cady*'s community caretaking exception to the Fourth Amendment can be invoked to justify a warrantless entry into a person's home. (See, e.g., and compare *State v. Deneui* (S.D. 2009) 775 N.W.2d 221 [community caretaking exception justified warrantless entry into a defendant's residence where police had concerns that someone inside might be in jeopardy from ammonia fumes]; and *State v. Vargas* (N.J. 2013) 63 A.3d 175 [a warrantless search of a person's residence cannot be justified in the name of community caretaking in the absence of some form of exigent or emergency circumstances].)

The California Supreme Court discussed the community caretaking function of police work in *People v. Ray* (1999) 21 Cal.4th 464, 477 (*Ray*), a plurality opinion addressing whether the function operates as an exception to the warrant requirement for entry into a private home. In *Ray*, police answered a radio call reporting an apartment unit with the front door ajar. When the officers looked inside, it appeared the apartment had been ransacked. No one responded to the officers' calls into the home. The officers believed they had either stumbled onto a burglary in process or that there may have been an unresponsive victim of a burglary inside. Upon entering the premises, the officers saw "a large quantity of suspected cocaine and money in plain view." (*Id*. at p. 468.)

12

Six justices voted to affirm the case and approve the search, but they split on which theory supported affirmance. Three justices in the lead opinion distinguished two exceptions to the warrant requirement – the exigent circumstances exception and the community caretaking exception. The lead opinion observed that police have a myriad of duties unrelated to criminal investigation, which are collectively referred to as "community caretaking functions." (*Ray*, *supra*, 21 Cal.4th at pp. 472, 467.) The exception allows an entry into a private home based on circumstances short of a perceived emergency for two reasons: to protect a person or property from harm. (*Id*. at p. 473.) In other words, the officers view the occupant as a potential victim rather than as a potential target of an investigation or as a potential suspect. (*Id*. at p. 471.) Application of the community caretaking exception must be considered in a case-by-case basis, considering " 'whether there is "evidence which would lead a prudent and reasonable official to see a need to act." The officer must "be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion." [Citations.]' " (*Id*. at p. 476.) Further, "'[t]he privilege to enter to render aid does not . . . justify a search of the premises for other purposes. [Citation.] To the contrary, the warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it. [Citations.]' [Citation.] 'The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry— the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance . . . and to provide that assistance . . . .' " (*Id*. at p. 477.) The lead opinion in *Ray* emphasized that application of the community caretaking exception is permitted only when officers are *not* engaged in searching for evidence or perpetrators of a crime because "'[t]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.'" (*Id.* at p.471.)

Former Chief Justice George wrote the concurring opinion, with which two other justices joined, and found the warrantless entry into the residence proper. However, the concurring opinion applied the long-recognized "exigent circumstances" exception to the

13

warrant requirement to justify the warrantless entry. (*Ray, supra*, 21 Cal.4th at pp. 480-482.)[7] The only other case cited by the People which refers to the community caretaking function involved a search of a car. (*People v. Madrid* (2008) 168 Cal.App.4th 1050.)

*Analysis*

Gabor contends the trial court's refusal to allow him to question witnesses, argue to the jury, or properly instruct on the lawfulness of the officer's entry into the home was error. He asserts this error foreclosed him from presenting his defense that the jury should find Officer Butler acted unlawfully when he entered and stayed in the Gabor home and thus he was not lawfully performing his duties. We agree.

It appears to us that the question of whether the community caretaking exception justifies a warrantless entry into a private residence is the source of confusion for many courts. Gabor has not asked us to rule categorically that the exception does not apply to police entry into a person's home. Here, we note only it is well-recognized that a person's expectation of privacy in an automobile is vastly different from the traditional expectation of privacy that attaches to one's residence. (*United States v. Martinez-Fuerte* (1976) 428 U.S. 543, 561 [automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls]; *Opperman, supra,* 428 U.S. at p. 368; see also *New York v. Class* (1986) 475 U.S. 106, 113 ["[A]utomobiles are justifiably the subject of pervasive regulation by the State"]; *Cardwell v. Lewis* (1974) 417 U.S. 583, 590 ["One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects"].) Thus, to the extent the community caretaking exception is applicable in Gabor's case as a basis for the prosecution's justification of the entry into his home, that is, that the exception supports a factual finding that Officer Butler was acting lawfully when he entered the home, an error occurred when the trial court failed to properly instruct on its definition and also failed to allow appropriate questioning and argument on the topic.

---

[7] Justice Mosk, the seventh justice, dissented.

The court ruled that it was the court's role to determine whether Officer Butler had been lawfully present inside the Gabor home. It refused to allow the defense to argue the propriety of the entry, or the appropriateness of continuing to remain in the house after being asked to leave. This ruling removed from the jury the task of deciding whether the prosecution had proved an element of both charged offenses; specifically, that Officer Butler was lawfully performing his duties when he entered the home and at the time of Gabor's resisting conduct. The trial court was not presented with a motion to suppress evidence in which it would have been the court's task to determine the lawfulness of a search.

Contrary to the People's arguments on appeal, the trial court needed to define the community caretaking exception to the warrant requirement in order for the jury to determine whether the prosecution proved the element of the charged offenses that Officer Butler was lawfully performing his duty at the time of the resisting conduct. The jury needed to understand that a police officer may lawfully enter a person's home only under certain circumstances. The court should have defined the community caretaking exception for the jury, explaining that its application is permitted only when officers are *not* engaged in searching for evidence or perpetrators of a crime. (*Ray*, *supra,* 21 Cal.4th at p. 471.) The jury should have been allowed to decide whether the police officer's conduct in the home was " 'carefully limited to achieving the objective which justified the entry,' " given that " 'the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.' " (*Id.* at p. 477.)

Most significantly here, the jury should have been informed that "'[t]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.'" (*Ray*, *supra*, at p. 471.) The defense contended the officer entered the home to investigate a possible child endangerment situation. Officer Butler repeatedly told the jury he entered the house to conduct an investigation and specifically to investigate a possible child neglect offense. Indeed, Gabor was initially charged with child endangerment.

15

A properly instructed jury may have considered Officer Butler's testimony about what he was doing to determine if his actions were lawful. If properly instructed and allowed to hear all the evidence and argument on the issue, a jury might have found the officer's entry unlawful or his continued presence in the home was unlawful after Andrew was safely inside and Officer Butler was repeatedly directed to leave. The jury might also have found that the officer did more than was reasonably necessary to determine whether assistance was needed and to provide such assistance.

Simply putting the words "community caretaking" in the instruction as one of the duties of police officers did not guide the jury in determining whether the community caretaking exception applied and could be followed in this case. A bracketed portion of CALCRIM No. 2670, the standard instruction dealing with a police officer's "lawful performance of his or her duties," instructs a jury to determine whether police lawfully entered a home without a warrant for the purpose of arresting a person in the context of exigent circumstances, and defines exigent circumstances as follows:

> "The term exigent circumstances describes an emergency situation that
> requires swift action to prevent (1) imminent danger to life or serious
> damage to property, or (2) the imminent escape of a suspect or destruction
> of evidence."

This instruction could have been modified for use in Gabor's case to define the community caretaking exception. By relieving the prosecution of its burden of proving an element of the charged offenses, the trial court violated Gabor's constitutional right to due process. (*People v. Cole, supra,* 33 Cal.4th at p. 1208.)

Gabor's case falls under the ambit of *People v. Wilkins* (1993) 14 Cal.App.4th 761 (*Wilkins*). In *Wilkins*, police responded to a residence to investigate a domestic violence report. When police arrived, they saw a woman outside the residence, crying and with red marks on her face and nose. She reported that the defendant, her husband, had hit her. She then asked the officers to go inside the residence to arrest him. The officers knocked on the door to the residence and told the defendant they needed to come inside and talk to him. The defendant opened the door, but refused to allow more than one

16

officer to enter. When the defendant attempted to close the door, an officer blocked the door with his foot and hand, forced the door open, and a struggle ensued inside the residence between the defendant and the officers that ended with the defendant's arrest. (*Id.* at pp. 767-768.)

Based on evidence presented at trial establishing the facts summarized above, a jury convicted the defendant of spousal abuse and resisting a police officer. (*Wilkins*, *supra*, 14 Cal.App.4th at p. 769.) As to the resisting count, the Court of Appeal held the trial court erred in failing to instruct the jury sua sponte on the exigent circumstances exception to the Fourth Amendment's warrant requirement in connection with section 69's "lawful performance of duty" element, but found that the instructional error was harmless. (*Id.* at pp. 776-777.) As the court reasoned: "In order for the officers to have effected a lawful non-consensual entry into the house to make a warrantless arrest, they must not only have had reasonable cause to believe defendant had committed a felony but there must also have been exigent circumstances justifying the officers' immediate entry without obtaining a warrant. [Citation.] The instructional lacuna is not one which can be cured simply by clarification and amplification because the instructions given completely omit to address a material constituent of an element necessary for conviction. [Citation.]" (*Id.* at p. 777.)

Further, in holding that the trial court had a duty sua sponte to instruct on exigent circumstances as a basis for lawful entry into the defendant's house, the *Wilkins* court explained: "Where, as here, there was no warrant, and, assuming there was no consent to enter, the arrest of defendant in his home was 'presumptively unreasonable.' [Citation.] . . . Thus, lawfulness of this felony arrest inside the home turns not only on reasonable cause [for the arrest,] but also on exigent circumstances and, because lawfulness of the arrest is an element of the offense charged, both issues [were required to be] submitted to the jury." (*Wilkins, supra,* 14 Cal.App.4th at p. 779, fns. omitted.)

The People argue that *Wilkins* "is distinguishable in three significant ways," none of which we find persuasive. First, the People argue Gabor's current case is not the same as *Wilkins* because the defendant there refused to allow the police officers to enter his

17

home and the officers used force to enter the home. In Gabor's current case, the issue is not whether Officer Butler used force to enter Gabor's home, but whether he entered the Gabor home lawfully or unlawfully, for whatever reason. Second, the People argue that, while the instructions in *Wilkins* were devoid of any content regarding an exception to the Fourth Amendment's warrant requirement, the instructions in Gabor's case referred to the community caretaking function. The problem with this argument is that the court's instructional reference to the community caretaking function was left hanging in the air, with no instruction on how to consider or apply its principles, and with no instruction explaining that it was an exception to the Fourth Amendment's requirement for a warrant. As for the People's argument that *Wilkins* is limited to the issue of exigent circumstances, while this is technically true, it does not address the problem that the jury at Gabor's trial was effectively precluded from deciding whether the prosecution proved beyond a reasonable doubt an element of the charged offenses under sections 69 and 148.[8]

We find the reasoning of *Wilkins* equally applicable in Gabor's case, which involved something less than an attempted entry to effect an arrest, namely, an entry apparently for purposes of conducting some form of investigation as to why a 10-year-old child was outside his home at noon on a Sunday. The jury should have been afforded the opportunity to decide whether Officer Butler acted lawfully in entering and in remaining in the Gabor home, particularly in light of his testimony that he understood that, "had [he] stayed outside whomever was in the house could have easily closed the door and that would have been it. [He] didn't have enough, for example, exigency, to enter the home. [He] didn't have consent, really."

---

[8]     We do not rule here as a matter of law that Officer Butler's entry into the Gabor home violated the constitutional protections afforded to a person in his or her own home or that Officer Butler was not lawfully performing his duties when he stepped over the threshold into Gabor's home. What we conclude is this was a question for the jury to decide, in determining whether the prosecution proved the elements of the section 69 and 148 offenses beyond a reasonable doubt.

Gabor's case is not like *Ray*, *supra*, 21 Cal.4th 464, and other cases that are discussed in the respondent's brief on appeal.  In *Ray*, a citizen reported to the police that an apartment door had been open all day, and "it's all a shambles inside."  Officers arrived at the scene and approached the front door, which was about two feet open.  The officers looked inside and noticed that the front room appeared to have been ransacked.  After knocking and announcing their presence, and after receiving no response, the officers entered the premises to determine if anyone was injured and whether a burglary was in progress.  Upon entering the premises, the officers observed suspected cocaine and money in plain view.  (*Id.* at p. 468.)  The People subsequently filed drug charges against the tenant.  (*Id.* at p. 469.)

The tenant/defendant filed a motion to suppress the drug evidence.  (*Ray, supra*, 21 Cal.4th at p. 468.)  The trial court granted the motion, finding that the officers had been engaged in a community caretaking function, but that no exigent circumstances justified entry into the defendant's apartment without a warrant.  The People appealed, and the Court of Appeal reversed the trial court based on a finding that the officers reasonably believed that an exigency existed.  On the defendant's petition for review, the Supreme Court affirmed the Court of Appeal.  At no point in *Ray* did any issue arise involving the prosecution's burden of proving the elements of the charged drug offenses at trial.

Finally, we reject the People's argument that any error in Gabor's case was harmless whether examined under either the ordinary instructional error standard of *People v. Watson* (1956) 46 Cal.2d 818, or the heightened constitutional standard of *Chapman v. California* (1967) 386 U.S. 18.  A jury could reasonably conclude that Officer Butler acted unlawfully when he entered Gabor's house, or when he refused Gabor's demand that he leave the home.  At a minimum, the defense was entitled to question the witnesses, argue the point, and have the jury determine the issue.  The jury was never given that opportunity because the trial court foreclosed those avenues.  We find the People's argument that the error was harmless because the jury was allowed to make a determination of the reasonableness of Officer Butler's conduct under the

19

community caretaking function exception to the Fourth Amendment's warrant requirement to be unpersuasive. The court's instructions referred to the "community caretaking function" obliquely, but did not define the concept as it related to any exception to the Fourth Amendment's warrant requirement or the lawfulness of Officer Butler's entry into Gabor's home.

## II.     Gabor's Remaining Claims

Gabor contends his convictions must be reversed because the trial court violated his state and federal constitutional rights to confront the witnesses against him when it unduly restricted his cross-examination of Officer Butler. Further, Gabor contends his convictions must be reversed because the court violated his federal constitutional right to due process, specifically, his right to present a defense, when it unduly restricted his cross-examination of Officer Butler. Finally, Gabor contends the cumulative effect of the trial court's errors requires reversal. We need not address these claims in light of our discussion above regarding the elements of the charged offenses.

### DISPOSITION

The judgment is reversed.


BIGELOW, P.J.

We concur:


RUBIN, J.


FLIER, J.

20