Filed 1/17/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIE OVIEDA,<br><br>    Defendant and Appellant. | 2d Crim. No. B277860<br>(Super. Ct. No. 1476460)<br>(Santa Barbara County) |

Over 50 years ago, wise and prescient Chief Justice Phil Gibson planted the judicial seed for what we now call the "community caretaking" exception to the Fourth Amendment. We apply it here. (*People v. Roberts* (1956) 47 Cal.2d 374, 379-380 (*Roberts*); see also *People v. Ray* (1999) 21 Cal.4th 464, 471 (*Ray*).)

Willie Ovieda appeals his conviction by plea to manufacturing concentrated cannabis (Health & Saf. Code, § 11379.6, subd. (a)) and possession of an assault weapon (Pen. Code, § 30605, subd. (a)), entered after the trial court denied his motion to suppress evidence (Pen. Code, § 1538.5). Pursuant to a negotiated plea, probation was granted with 180 days county jail and outpatient mental health treatment.

Appellant contends his Fourth Amendment rights were violated when officers, in responding to a 911 call that he was about to shoot himself, made a "cursory search" of appellant's

residence to make sure no one was hurt and no firearms were lying about.[1]  The trial court factually found that the search was a reasonable exercise of the officers' community caretaking duty. We affirm because there is no reason to apply to the exclusionary rule.  As we shall explain, the instant entry and "cursory search" had nothing to do with the gathering of evidence to support a criminal prosecution.  This is, of course, the lynchpin for application of the exclusionary rule.  When a person unsuccessfully attempts suicide in his residence with a firearm, and thereafter comes outside, the police may enter the residence to perform a "cursory search" pursuant to their "community caretaking" duty.

*Facts and Procedural History*

On the evening of June 17, 2015, appellant's sister told a 911 operator that appellant was threatening to kill himself and had attempted suicide before.  Santa Barbara Police Officer Mark Corbett responded to the 911 call.  A second officer telephoned Trevor Case inside the house.  Case was appellant's friend.  Case went outside and reported that appellant had threatened to commit suicide and tried to grab several firearms in his bedroom.  Case and his wife had to physically restrain appellant to keep him from using a handgun and a rifle to kill himself.  Case's wife pinned appellant down as Case searched the bedroom for other firearms.  Case moved a handgun, two rifles, and ammunition to the garage but did not know whether appellant had additional firearms or weapons in the house.

Appellant agreed to come outside, was detained, and falsely denied having made suicidal comments or that he had any

---

[1] This phrase, "cursory search," is coined by Chief Justice Gibson.  (See *infra*, p. 8.)

firearms.  Appellant said he was depressed because a friend committed suicide the week before.  Officer Corbett described the situation as "emotional and dynamic."  He believed a cursory search was necessary because it was unknown how many more weapons were in the house, whether the weapons were secure, and whether anyone inside the house needed help.  It was a concern because the person who made the 911 call, appellant's sister, was not at the scene and the officers did not know anything for sure.  Officer Corbett believed he was "duty bound" to make a safety sweep to make sure no one inside was injured or needed medical attention.  A second officer, Officer Daniel Garcia, agreed a safety sweep was necessary to confirm that; 1. there were no other people in the house; 2. nobody else was hurt; and 3. there were no dangerous weapons or firearms left out in the open.

Officer Corbett and a second officer made a cursory sweep of the house and saw, in plain view, a rifle case, ammunition, magazines, and equipment to cultivate and produce concentrated cannabis.

There was a large, industrial drying oven with tubes, wires, and ventilation ducts that led to the garage, as well as marijuana and concentrated cannabis in plain view.  Based on 15 years in narcotics-related investigations, Officer Corbett believed the marijuana lab posed an immediate danger because manufacturing concentrated cannabis is "a volatile process that involves heat and when mistakes are made explosions and fires can occur."

Inside the garage, officers saw three rifles and a revolver in a tub.  Two rifles were automatic or semi-automatic assault rifles that Officer Corbett believed were illegal.  The officers also found four high capacity magazines for an assault

style weapon, a firearm silencer, a long range rifle with a scope, more than 100 rounds of ammunition, equipment for a hash oil laboratory, butane canisters, miscellaneous lighters and burners, a marijuana grow, and a bucket filled with marijuana shake. The firearms included a .50 caliber rifle, an Uzi sub-machine gun, a .357 caliber revolver, a pistol-grip 12 gauge shotgun, and a .223 caliber sub-machine gun.

Appellant brought a motion to suppress evidence. The prosecution argued that the entry into appellant's residence was justified under the community caretaking exception and the protective sweep doctrine.[2] The trial court ruled that the community caretaking exception is "what guides the Court's decision" and denied the motion to suppress evidence. The trial court found the officers' testimony credible as to "what they were concerned about and what they didn't know. And so I [find] it credible that they wanted to remove firearms, they didn't know if there were others in the residence, either victims or other people who might cause a harm." It expressly found that the officers were "not required to accept Mr. Case's word that he removed the firearm that Mr. Ovieda had reached for. . . . And I believe under these circumstances that the officers would be subject to criticism, in fact, if anything had occurred that they would be judged neglectful in not entering the residence and doing what was described as quick search, . . . looking in closets, looking for other people, and looking for other weapons."

---

[2] On appeal, the Attorney General concedes that the protective sweep doctrine, which is typically made in conjunction with an in-home arrest, does not apply. (See *Maryland v. Buie* (1990) 494 U.S. 325, 337.) The Attorney General also conceded at oral argument that under the circumstances here, a search warrant could not issue.

4

*Community Caretaking Exception*

Appellant argues that the entry into his residence violated the Fourth Amendment. On review, we defer to the trial court's express and implied factual findings which are supported by substantial evidence and determine whether, on the facts so found, the search was reasonable under the Fourth Amendment. (E.g., *People v. Glaser* (1995) 11 Cal.4th 354, 362.) The trial court's express factual findings are fatal to this appeal.

In *Ray, supra*, 21 Cal.4th 464, our Supreme Court stated that the community caretaking exception to the Fourth Amendment permits police to make a warrantless search of a home if the search is unrelated to the criminal investigation duties of the police. (*Id.* at p. 471.) "Upon entering a dwelling, officers view the occupant as a potential victim, not as a potential suspect." (*Ibid.*) "Under the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry" to preserve life or protect property. (*Id.* at p. 473.) Officers are expected to ""aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve conflict," . . . and "provide other services on an emergency basis." . . .' [Citation.]" (*Id.* at p. 471.)

Such is the case here. Officer Corbett responded to the 911 call to help a suicidal person. The cursory search had nothing to do with a criminal investigation and no one claims the 911 call was a ruse or subterfuge to gain entry and search for evidence of a crime. "'[C]ommunity caretaking' . . . , [is] 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' [Citation.]" (*Colorado v. Bertine* (1987) 479 U.S. 367, 381.)

5

Appellant argues that *Ray* has no binding precedential value because it is only a plurality opinion.  (See, e.g., *People v. Karis* (1988) 46 Cal.3d 612, 632.)  He contends the officers were required to leave when appellant denied that he was suicidal.  The argument is premised upon the theory that a suicidal person has the Second Amendment right to possess and bear firearms and that officers responding to a 911 call that someone is threatening suicide must leave when the person comes outside and says there is no problem.  We assess the reasonableness of the officer's actions at the time they undertook them.

Officer Corbett responded to a 911 call from a concerned family member that appellant was about to take his life and had attempted suicide before.  Appellant's friend, Trevor Case, confirmed that appellant tried to reach for a firearm and shoot himself.  Case feared that appellant would try to hurt himself and that there were other weapons or firearms in the house.  There was an on-going safety concern because appellant lied about the firearms and his suicidal ideation.  Appellant was detained and handcuffed.  By his actions, appellant put himself at risk, his friends at risk, and the responding officers at risk. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 271 [Police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal person.  Protection of the physical safety of the police officers and other third parties is paramount]; see also *Allen v. Toten* (1985) 172 Cal.App.3d 1079, 1089, fn. 8.)

As discussed in *Ray*, "'[o]ne is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent serious harm to . . . the other

6

or a third person, or the land or chattels of either . . . .' [Citations.]" (*Ray, supra*, 21 Cal.4th at p. 474.) It matters not whether a police officer, a fireman, an ambulance driver, or a social worker responds to the suicide call. As a matter of common sense, it would be anomalous to deny a police officer charged with protecting the citizenry the privilege accorded every other individual who intercedes to aid another or protect another's property. (*Ibid*.) "'A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. [Citations.]'" (*Ibid*.)

Pursuant to the community caretaking exception, police officers are expected to check on the welfare of people who cannot care for themselves or need emergency services. (*Ray, supra*, 21 Cal.4th at pp. 471-472.) "The policeman, as a jack-of-all-emergencies, has 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offences'; by default or design he is also expected to 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court." (3 LaFave, Search and Seizure (5th ed. 2012) § 5.4(c), pp. 263-264, fns. omitted.)

Appellant contends that the community caretaking rule does not apply to residential searches. Surely a police officer may enter a residence to protect a suicidal person and secure the premises if firearms are believed to be present. (See, e.g., *Brigham City v. Utah* (2006) 547 U.S. 398, 400, 403 [officer may

7

enter home without a warrant to render emergency assistance to an injured occupant or to protect occupant from imminent injury].)  The officers had a duty to prevent the possibility that the firearms "would fall into untrained or . . . malicious hands." (*Cady v. Dombrowski* (1973) 413 U.S. 433, 443.)

When it comes to choosing between the Fourth Amendment protection against warrantless searches and the preservation of life, the preservation of life controls.  That was decided more than 50 years ago in *Roberts*, *supra*, 47 Cal.2d 374.  There, officers were told that a suspect living in an apartment had missed work and was sickly.  (*Id.* at p. 378.)  After knocking on the door and receiving no response, the officers heard moans and groans that sounded like a person in distress.  (*Ibid.*)  The officers believed someone needed emergency assistance, made a warrantless entry, and saw a stolen radio on the kitchen table that resulted in defendant's arrest for second degree burglary.  Defendant argued that his Fourth Amendment rights were violated.  The officers, however, believed a person in distress was inside the apartment and needed help.  (*Id.* at pp. 378-379.)  When asked about the moaning sounds, the officers said "'it could be pigeons, pigeons moan.  There are pigeons in the area.'"  (*Id.* at p. 378.)

Chief Justice Gibson wrote:  "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose.  [Citations.]"  (*Roberts*, *supra*, 47 Cal.2d at p. 377.)  In the course of conducting a cursory search, officers do "not have to blind themselves to what was in plain sight simply because it

was disconnected with the purpose for which they entered. [Citations.]"  (*Id.* at p. 379.)

Similarly, in *People v. Payne* (1977) 65 Cal.App.3d 679, a reliable informant reported that appellant was molesting children in a garage bedroom.  (*Id.* at p. 681.)  Officers saw a 10 to 12 year old boy enter the garage, were concerned that appellant would harm the boy, forced their way into the garage bedroom, and found a partially dressed boy on a bed in the garage.  (*Id.* at p. 682.)  Citing *Roberts*, the Court of Appeal held that the victim's "'right to physical and mental integrity [simply] [outweighed] the right of [appellant] to remain secure in his domestic sanctuary . . . .'  [Citation.]"  (*Id.* at p. 684.)

The rules and rationale of *Ray*, *Roberts* and *Payne* dictate affirmance here.  There, the officers were conducting criminal investigations.  Here, they were not.  This entry was a pure community caretaking entry and a fortiori, the community caretaking rule applies with more persuasive force.

The community caretaking rule is alive and well.  So is appellant because he was saved by the intervention of friends and the police who confiscated his firearms.  Principles of stare decisis require that we follow *Ray* and *Roberts*.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  To say that the officers were required to get a warrant before entering the house and garage would be at variance with common sense and violative of the letter and spirit the "community caretaking" rule.  "There is no war between the Constitution and common sense."  (*Mapp v. Ohio* (1961) 367 U.S. 643, 657.)

*Response to Dissent*

The dissent's bright line rule unreasonably stifles a police officer's duty to proactively keep the peace for everyone in

9

the community.  The presenting situation posed an extreme danger for appellant, his friends, the police, and the neighbors.  A literal and mechanical application of the letter of the Fourth Amendment would require the officers to walk away from appellant's doorstep.  But the courts must consider the reason for the exclusionary rule.  Traditionally, the premise of the exclusionary rule is that it applies only if the police are enforcing the criminal law, i.e., they are entering a residence to search for evidence of crime.  That did not happen here.

Here, the officers did not fully comprehend what was confronting them when they entered appellant's residence.  Police officers have a healthy skepticism about what they are told in a volatile situation preferring to conduct their own investigation.  Here, they wanted to safeguard everyone and they wanted to separate appellant from his firearms.  As factually found by the trial court, they were not required to believe that there was no one in the house and that the firearms were secured.  Should they be allowed to enter a residence and defuse a "powder keg" waiting to explode when appellant would return to his residence?  The answer is "yes."  Loaded firearms are inherently dangerous as a matter of law and even though it is constitutionally permissible to possess them in a residence, it is quite another thing to allow them to remain in the possession of a suicidal person.  Our holding does not give the police carte blanche to indiscriminately enter a residence on whim or caprice.  Where, as here, a defendant threatens to kill himself with a firearm in his house, he is in a poor posture to claim that the police may not enter it to safeguard everyone even if he is coaxed out of the house prior to entry.

The dissent acknowledges that "had" the officers believed appellant was a danger to himself, they could have confiscated his firearms. (Dissent at p. 6) The record does not expressly show that the officers believed this to be the case because no one asked the question. But the inference that they entertained this belief is a reasonable inference. Suicidal persons are a danger to themselves. Every peace officer knows this. The only reason that appellant was not taken to a mental health facility was because, thereafter, probable cause developed for his arrest.

As Justice Gilbert said in his dissent in *Unzueta v Ocean View School Dist.* (l992) 6 Cal.App.4th 1689, 1705: "A mechanical, literal interpretation of the statute [or here, the Fourth Amendment] in the lifeless atmosphere of a vacuum creates a result contrary to public policy, contrary to legislative intent [or Constitutional intent], contrary to common sense, and contrary to our shared notions of justice." We agree with the trial court that the officers would have been subject to criticism if they had not separated appellant from his firearms.

*Disposition*

The judgment (order denying motion to suppress) is affirmed.

CERTIFIED FOR PUBLICATION.


YEGAN, J.

I concur:


GILBERT, P. J.

11

PERREN, J., Dissenting.

I respectfully dissent.

Chief Justice Gibson's "judicial seed" will not blossom in this fallow field.

Freedom from unreasonable government intrusion is at the core of the Fourth Amendment, which "draws 'a firm line at the entrance to the house.'" (*Kyllo v. United States* (2001) 533 U.S. 27, 31, 40.) "'[P]hysical entry of the home is the chief evil against which . . . the Fourth Amendment is directed.' [Citation.] And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment." (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748.) "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." (*Payton v. New York* (1980) 445 U.S. 573, 586.)

Relying on a "community caretaking" theory, the majority approves a warrantless intrusion into a home based solely upon police speculation about what they "could" find inside. The officers admittedly had *no* information that anyone, child or adult, was inside the house and required help. Indeed, everyone reported to be in the house was outside and completely under the officers' control, including the person they came to rescue, appellant Ovieda. The officers did not believe that appellant was a danger to himself or others. Because the officers had no objectively reasonable belief that searching the home was imperative, I conclude that the trial court should have granted appellant's motion to suppress evidence seized during the search.

The facts of this case are undisputed. A caller informed police that appellant was at home and suicidal, but had been disarmed by two friends who were with him. Officers

1

surrounded the home.  At their request, and accompanied by his friends, appellant voluntarily came outside, was frisked and promptly handcuffed.  He was unarmed.  He denied suicidal thoughts or having guns.  The officers were told that one of the friends had moved guns into the garage.  Although the officers had no reason to believe that anyone was in the house, two of them entered the home with guns drawn to conduct, in their words, a "protective sweep to secure the premises."  Inside, they found illegal weapons and a cannabis oil lab.[1]

On these facts, the search was unreasonable under any theory, whether it be "community caretaking," "emergency aid" or "exigent circumstances."  At the time of the search, the situation was stabilized, appellant was restrained, and everyone reported to have been in the house was outside and unharmed.  The officers had no information that anyone was in the house nor did they suspect that a crime had been committed.  Therefore, the police could not lawfully enter and search the premises absent consent or a search warrant.

Supreme Court cases authorizing police entry into a house without a warrant in an emergency are circumscribed by their facts.  As I explain below, this case does not resemble the type of emergency or exigency that would justify a warrantless entry.

*First*, an emergency justifying the entry and search of a home may arise when objective evidence leads police to believe that they must render immediate aid because a person inside is injured or in distress.

---

[1] The majority's statement of facts focuses on what the officers found.  The officers should not have been inside of appellant's house in the first place.

In a factually distinguishable case relied upon by the majority, *People v. Roberts* (1956) 47 Cal.2d 374, 376, 378, police entered the home of someone reported to be "sickly" when they "heard several moans or groans that sounded as if a person in the apartment were in distress." The warrantless entry "was lawful for the purpose of rendering aid." (*Id.* at p. 380.) A report that a person is injured and bleeding, coupled with blood stains outside the home and a neighbor's confirmation that an injured person is within, justify police kicking in the door to help the person. (*Tamborino v. Superior Court* (1986) 41 Cal.3d 919, 921-922, 924-925.)

The emergency aid theory applies when the police see shooting victims outside of a house, and believe that injured persons inside the house require immediate intervention. In *People v. Troyer* (2011) 51 Cal.4th 599, 607-609, 612, police responding to a report of shots fired found badly injured people on the porch of a home and blood on the front door, a clear emergency that justified immediate entry into the home to look for additional victims or a suspect. The court recognized the right of the police to enter without a warrant, given their objectively reasonable belief that an occupant was seriously injured. After a shooting victim was brought to a hospital, as described in *People v. Hill* (1974) 12 Cal.3d 731, 754-755, officers found fresh bloodstains on the porch, fence and auto outside a house and saw blood on the floor inside the house, an exigency justifying an entry to locate wounded persons, because waiting for a warrant could have resulted in the loss of life.

Here there was no such evidence. At the time of this search, no one was in appellant's house moaning and groaning, no gunshots were reported, and no bloodstains were seen.

3

Instead, appellant was outside of his house, unarmed and unharmed. There was no justification for the officers to enter appellant's house to render aid.

**_Second_**, an emergency may arise if police believe that a crime is in progress in a house. In *People v. Ray* (1999) 21 Cal.4th 464, police responded to a report that Ray's front door was open and the inside was in shambles. On arrival, officers found the scene as described; believing that a burglary was in progress or just took place, they entered to look for possible victims. Using a "community caretaking" theory, the state Supreme Court emphasized that police authority to enter is narrowly limited by the need to ascertain whether someone in the house is in need of assistance and to provide that assistance. (*Id.* at p. 477.) No such facts were present in this matter.

In *Brigham City v. Stuart* (2006) 547 U.S. 398, 406, the U.S. Supreme Court allowed a warrantless entry when police saw a violent fracas inside a house; officers could enter to rescue a bleeding occupant and stop the violence. In *Michigan v. Fisher* (2009) 558 U.S. 45, police responding to reports of a domestic dispute saw the defendant inside his house with a cut on his hand, screaming and throwing things, and blood on his front door and his car; in the Court's view, the police had an objectively reasonable belief that the defendant might be harming a child or spouse, or would hurt himself in his rage. This danger justified an immediate entry without a warrant and did not bar use of evidence obtained during the entry. (*Id.* at pp. 48-49.)

Here, the police did not see a crime or altercation unfolding inside the house before entering, nor did they believe that a crime had just taken place. Instead, they telephoned appellant inside the house and asked him to walk outside. He

4

complied.  Afterward, they searched the house.  No immediate warrantless entry was justified once appellant was outside.

   ***Third***, the police may enter a house in an emergency to detain a suicidal person inside the house for a mental evaluation.  The key to cases involving a potential suicide at a home is a pressing need for police to act *but no time for them to secure a warrant*.  For example, in *Sutterfield v. City of Milwaukee* (7th Cir. 2014) 751 F.3d 542, police entered a home to detain a woman for a mental evaluation after she remarked to her psychiatrist, "'I guess I'll go home and blow my brains out.'"  (*Id.* at p. 545.)  The court concluded that the officers had to act expeditiously by forcing entry during the unfolding crisis.  (*Id.* at p. 566.)

   In *Fitzgerald v. Santoro* (7th Cir. 2013) 707 F.3d 725, 728-729, officers forced a warrantless entry into the home of an apparently suicidal person to seize her for a mental evaluation.  The entry was deemed justified based on exigent circumstances, because the officers objectively and reasonably believed when they entered the home that the occupant was in need of immediate assistance.  (*Id.* at pp. 731-732.)  A person with a gun who is threatening suicide may be frisked in the doorway of his home, to preserve the safety of everyone present.  (*United States v. Wallace* (5th Cir. 1989) 889 F.2d 580, 582, citing *Terry v. Ohio* (1968) 392 U.S. 1, 23.)

   Here, the officers—who had no reason to believe that an injured, endangered or suicidal person was in the house— entered to conduct a "protective sweep."[2]  The People's post-search rationale of "community caretaking" is entirely unsupported by this record.  Appellant was standing on the

---

  [2] An inapt theory that the People abandoned on appeal.

sidewalk in handcuffs.  The others known to be in the house were also outside.  The emergency was over:  the police were not justified in their search of appellant's home—whether cursory or detailed—without his consent or a search warrant.  (See *State v. Hyde* (N.D. 2017) 899 N.W.2d 671, 677 [police alerted to a possibly suicidal person by his relatives could not enter his house without a warrant because they lacked a reasonable basis to believe there was an ongoing emergency or immediate need to protect his life].)

Had police believed that appellant was a danger to himself or others they would have been justified to take him into custody.  (Welf. & Inst. Code, §§ 5150 et seq. [police may take into custody someone who is gravely disabled or a danger to himself or others, for an assessment, evaluation and crisis intervention].)  State law provides a detailed mechanism for seizing weapons *if* the police believed that someone is "5150."  The police may confiscate weapons belonging to persons detained for a mental health evaluation.  (Welf. & Inst. Code, § 8102; *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1500 ["Section 8102 authorizes the seizure and possible forfeiture of weapons belonging to persons detained for examination under section 5150 because of their mental condition"].)  A detention to evaluate a person's mental condition permits the issuance of a search warrant to seize firearms.  (Pen. Code, § 1524, subd. (a)(10).)

The police did not invoke these justifications to search appellant's home or seize his guns.  The majority infers that the officers believed appellant to be a danger to himself.  (Maj. opn. ante, at p. 11.)  Tellingly, however, neither the prosecutor nor the Attorney General argued that the police detained appellant because they felt he was a danger to himself

6

or others and intended to transport him to a mental health facility pursuant to the Welfare and Institutions Code. The inference drawn by the majority is not supported by the record or by arguments offered in the trial court or on appeal.

Mere possession of guns is not a valid reason to search a home, unless the police determine that the gun owner must be detained for a mental health evaluation. Citizens may possess guns in their homes. (*District of Columbia v. Heller* (2008) 554 U.S. 570, 635.) The Attorney General argues that officers entered the home to merely "secure" appellant's guns, although it is not clear how they could achieve that without "seizing" the guns. The trial court "found it credible that they wanted to remove firearms." But the officers did not believe that appellant posed a danger to himself or others; it follows that their seizure of his guns was unauthorized.

The majority adopts the Attorney General's reasoning, asking rhetorically, "Surely a police officer may enter a residence to protect a suicidal person and secure the premises if firearms are believed to be present." (Maj. opn. ante, at p. 7.) The answer is "Yes" if the armed person is inside the residence and the police must enter to take the person into custody for a mental health evaluation. This strawman analysis fails, however, because appellant was outside of his house and not believed to be a danger to himself or others.

The sole justification offered by police for the entry was to check for people who might be present or injured. But everyone reported to be in the house was outside and accounted for. While officers could have sought appellant's permission to enter, they did not. While they could have detained appellant for evaluation at a mental health facility and sought a search

7

warrant to seize his weapons, they did not.  (Pen. Code, § 1524, subd. (a)(10).)  Nonetheless, they entered to search.  Based on the facts known to them at the time, they could not.

Under an objective standard of reasonableness, the police could not lawfully search appellant's home.  At the time of the search, appellant was standing outside the house in handcuffs, being interviewed by the police.  The exigency that brought the police to appellant's home—his threatened suicide—was fully controlled before the search took place.

There is no showing that anyone was in imminent danger in the house so as justify an immediate, warrantless entry.  The police had no information that an injured spouse or hidden child required aid.  The occupants came outside before the search, in direct response to the police request that they do so.  Officer Garcia testified that "we didn't have any specific information at the time that . . . there was someone in there."  Officer Corbett's testimony that "there could be a child" or "there could be somebody injured" was pure speculation.  Police action cannot be justified by what they did not know, or on a hunch or unparticularized suspicion.  (*Terry v. Ohio*, *supra*, 392 U.S. at p. 27; *People v. Block* (1971) 6 Cal.3d 239, 244.)

The totality of the circumstances in the present matter did not present an emergency justifying a warrantless entry.  The officers were not faced with a tense, uncertain or evolving situation at the time of the search.  No gunshots were reported before their arrival.  They knew that appellant had been armed with a gun and were entitled to handcuff and frisk him when he walked outside and approached them, to preserve their safety and that of third parties.  At that point, the need for the police to render emergency aid ceased.

Theories of "community caretaking," "emergency aid," or "exigent circumstances," are inapposite on this record. The police had *no* information that anyone was in the home let alone someone who needed immediate assistance or protection, *no* weapons were accessible to the handcuffed Ovieda, and *no* crime was committed or in progress. Any emergency that might mandate swift action—without a search warrant to prevent imminent danger to life—ended when appellant voluntarily came out of the house, along with the friends who were assisting him.

The majority speculates that the police entered appellant's home to seize his guns and save his life, because he might have shot himself once they left. The officers did not articulate any such fear for appellant's safety during the suppression hearing.

I do not question the officers' motives, honesty or sincerity. Their conduct, however, is circumscribed. In this situation, where a crisis has been averted, the officers have options: (1) they can seek consent to search; (2) they can seek a search warrant if the person's mental health is so deteriorated that he presents a danger to himself or others; or (3) they can wait to see how or if the situation evolves. If the person's ensuing conduct causes concern for his safety or the safety of others, they could seek a search warrant. The burden is on the State to demonstrate justification for the search. It has failed to do so.

The theme of the majority is that the police had to act. The officers' collective lack of information that anyone was in jeopardy, that anyone was upon the premises or that anyone was injured or in peril belies the state's theory. Ignorance of a fact, without more, does not raise a suspicion of its existence. The protection afforded by the Constitution would be sorely

compromised if what is not known or reasonably suspected would suffice for probable cause.  I conclude the police could not lawfully enter and search the premises absent consent or a search warrant.  The search was unlawful under both the State and Federal Constitutions.  Appellant's motion to suppress evidence should have been granted.  (Pen. Code, § 1538.5.)

<u>CERTIFIED FOR PUBLICATION</u>


PERREN, J.

10

Jean M. Dandona, Judge

Superior Court County of Santa Barbara

_____

Law Offices of Elizabeth K. Horowitz, under appointment by the Court of Appeal for Defendant and Appellant. Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Andrew S. Pruitt, Deputy Attorney General, for Plaintiff and Respondent.